Margaret DUPUIS, Plaintiff,

v.

FEDERAL HOME LOAN MORTGAGE CORPORATION, Defendant.

Civ. No. 93–299–P–H.

United States District Court, D. Maine.

Jan. 9, 1995.

Kurt E. Olafsen, Portland, ME, for plaintiff.

David J. Jones and Keith Jacques, Jensen, Baird, Gardner & Henry, Biddeford, ME, for defendant.

## ORDER ON A STIPULATED RECORD

HORNBY, District Judge.

This case presents the always difficult question of which innocent party must bear the unavoidable consequences of a third party's wrongful acts. Fidelity Guarantee Mortgage Corporation ("Fidelity"), the original lender, caused much of the loss underlying this lawsuit. Fidelity, however, has been adjudged bankrupt and is judgment proof. The loss, therefore, must fall on one of the two innocent parties to this suit, the borrower Margaret Dupuis or the purchaser of her note and mortgage in the secondary market, Federal Home Loan Mortgage Corporation ("FHLMC").

The parties have stipulated the record for purposes of the liability issues in Dupuis's Complaint.

### JURISDICTIONAL BASIS

The court has original jurisdiction of this matter. 12 U.S.C. § 1452(f) (creating original jurisdiction in federal district courts in all civil actions to which FHLMC is a party).

### BACKGROUND

On July 30, 1990, Margaret Dupuis signed a promissory note to Fidelity for $156,000. She secured the note with a mortgage on her home. Dupuis intended to use the loan to repay creditors and finance a new addition to her home. At the closing or soon thereafter, Fidelity disbursed $115,152.44 of the loan to Dupuis or on her behalf. Fidelity and Dupuis agreed that Fidelity would hold $6,000 as a performance escrow and $1,601.88 for a tax and insurance escrow. Fidelity also held back $30,997.56, ostensibly for a home improvement escrow, only $6,000 of which was ever disbursed to Dupuis and $150 of which was disbursed to a private building inspector to inspect the Dupuis property. In fact, no written agreement ever established the escrow, and Fidelity's lawyer simply returned the money to Fidelity on October 10, 1990. Monthly payments were nevertheless calculated as if the entire loan had been paid to Dupuis. After intermittent periods of missed payments and makeups, Dupuis stopped making monthly payments in February, 1992.

On August 9, 1990, without notifying Dupuis, Fidelity assigned the note and mortgage to FHLMC as part of a bulk transfer of loans. FHLMC, in turn, contracted with Fidelity to service the note and mortgage pursuant to the terms of FHLMC's Sellers' and Servicers' Guide. Fidelity serviced the loan until the fall of 1992 when it filed for bankruptcy and ceased operations. Dupuis was unaware of the FHLMC assignment and servicing agreement until then.

Dupuis never received the remaining $24,-847.56 home improvement "escrow" or the $6,000 performance escrow.

On occasion, Fidelity failed to pay Dupuis's homeowner's insurance premiums and real estate taxes from the tax and insurance escrow (sometimes but not always the escrow was insufficient) and consistently failed to pay Dupuis any interest on this escrow.

Fidelity persuaded Dupuis to pay a contractor $1,500 out of her own pocket to complete the roof on the addition and agreed to credit Dupuis's loan balance for that amount. Despite the agreement, Fidelity never credited Dupuis's account for the $1,500 she spent.

In July of 1991, vandals damaged Dupuis's swimming pool. In the fall of 1991, Dupuis received an insurance claim check of $5,458 for the damage. Dupuis signed the check over to Fidelity. Fidelity never credited Dupuis's loan for the amount of the check.

Fidelity's actions that Dupuis challenges were all unauthorized and improper under the Sellers' and Servicers' Guide.

On April 21 and May 11, 1993, FHLMC, through its new loan servicer, First Commercial Mortgage Company, notified Dupuis that her note was in default. FHLMC maintains that Dupuis must pay the full amount of the $156,000 note with interest and late charges, even though she never received over $30,000 of the loan and despite Fidelity's failure in servicing the loan to credit her with various items. As of September 22, 1994, the amount due under the note and mortgage, not considering any set-offs, was $223,542.95, with additional interest and late charges continuing to accrue.

Dupuis brought this lawsuit against FHLMC, and FHLMC counterclaimed to collect on the note and foreclose the mortgage.

My earlier summary judgment order left unresolved three counts, and part of a fourth, of Dupuis's Complaint. It is to these matters that I now turn.

## BREACH OF CONTRACT (COUNT I)

The stipulated record contains five items that are clear breaches of contract: (1) Fidelity's failure to disburse the entire loan proceeds to Dupuis, (2) Fidelity's failure to pay Dupuis's homeowner's insurance premiums and real estate taxes from the fund escrowed for that purpose, (3) Fidelity's failure to pay interest on the escrowed funds, (4) Fidelity's failure to credit Dupuis's loan $5,458, the amount of the insurance claim check for the vandalized pool, and (5) Fidelity's failure to credit Dupuis's loan the amount she paid to close in the roof. FHLMC does not contend that these are not breaches. Instead, FHLMC argues that it has no responsibility or liability for Fidelity's wrongdoing.

■ Although the parties have not addressed choice of law, federal common law governs because of the important federal in-

terests involved. *See Federal Home Loan Mortgage Corp. v. Nazar,* 100 B.R. 555, 557–58 (D.Kan.1989). The only other possibility is Maine law. Whichever law I apply, I reach the same conclusion. Under both federal common law and Maine law, the *Restatement (Second) of Agency* provides the governing principles because both the federal courts and the Maine Law Court regularly rely on the *Restatements* where, as here, no applicable precedents exist. *See United States v. Gil,* 657 F.2d 712, 715 (5th Cir. 1981); *Bonk v. McPherson,* 605 A.2d 74, 78 (Me.1992).

### (a) Agency Principles

The parties agree that Dupuis had no knowledge that FHLMC owned her note and mortgage until after Fidelity's bankruptcy. Thus, the typical arguments in agency cases about "apparent authority" are inapplicable. *See Libby v. Concord Gen. Mut. Ins. Co.,* 452 A.2d 979, 983 (Me.1982). So far as Dupuis was concerned, Fidelity had no "apparent authority" to act on FHLMC's behalf; to Dupuis's knowledge, Fidelity was all there was. At first glance, that might seem to end the matter. If Dupuis had no knowledge that FHLMC held her note and mortgage, why should she now have any recourse against FHLMC? Why not limit her recourse to (bankrupt) Fidelity? The question cannot be answered as easily as it is asked because FHLMC, for its part, is striving to hold Dupuis liable for amounts far beyond what Fidelity could have collected. It is FHLMC that wants to avoid the defenses and claims Dupuis would have if Fidelity were trying to collect on the note and foreclose the mortgage.

The *Restatement (Second) of Agency* announces: "A general agent for an undisclosed principal authorized to conduct transactions subject his principal to liability for acts done on his account, if usual or necessary in such transactions, although forbidden by the principal to do them." *Restatement (Second) of Agency* § 194 (1957).[1] A general agent is

---

1. Dupuis asserted at oral argument that this section only applies to torts and that section 186 applies to contracts. It appears, however, that section 186 applies to the creation of liability on the part of an undisclosed principal for acts done

by an agent acting *within* his authority. Section 194, on the other hand, deals with the creation of liability for *un*authorized acts. The stipulated record reveals that the acts in question here were unauthorized.

"an agent authorized to conduct a series of transactions involving a continuity of service." *Id.* § 3(1).

■ FHLMC was certainly undisclosed so far as Dupuis was concerned. It is pretty obvious, then, that, if Fidelity was a general agent for FHLMC, FHLMC is liable, as an undisclosed principal, for Dupuis's contract claims. All that *Restatement* section 194 requires in addition is that Fidelity have been authorized to conduct transactions and that Fidelity's actions done on FHLMC's account be "usual or necessary in such transactions." Section 194 makes clear that whether FHLMC authorized or prohibited the specific acts in question is irrelevant. FHLMC hired Fidelity to service loans and mortgages in accordance with the Sellers' and Servicers' Guide, including those of Dupuis. Thus, Fidelity was "authorized to conduct transactions" involved in such servicing. Although FHLMC points to provisions of its Guide which, it argues, prohibited Fidelity from treating the Dupuis loan the way it did, Fidelity's acts—done on FHLMC's account— were "usual or necessary" acts in a servicing relationship. That is true for the withholding of loan proceeds until the servicer is satisfied that the improvements have been suitably completed; the collection and payment of real estate tax and insurance obligations; the payment of interest on escrowed funds; dealing with a casualty loss on the secured premises and allocation of insurance proceeds for the loss; and negotiating with the borrower to improve the premises in exchange for a further disbursement or a credit against the loan due.

■ FHLMC argues that Fidelity was an independent contractor rather than an agent and has pointed to language in the Guide that servicers are only independent contractors. But that position misperceives the applicable law of agency. A principal/independent contractor relationship is to be distinguished from a master/servant relationship, but an independent contractor can still be an agent. *Baker Bus Serv., Inc. v. Keith,* 416 A.2d 727, 730 n. 2 (Me.1980); *Restatement (Second) of Agency* § 2(3). Lawyers appearing in court on behalf of a client are the classic example. *See Nyer v. Carter,* 367 A.2d 1375, 1378 (Me.1977). Plainly, Fidelity serviced this note and mortgage on behalf of FHLMC and in that respect acted as agent.[2] The real issue is whether Fidelity should be treated as a *general* agent. The *Restatement* gives two choices: "general agent," which I have already defined (and which produces liability for the undisclosed principal), and "special agent"—"an agent authorized to conduct a single transaction or a series of transactions not involving continuity of service," *Restatement* § 3(2) (and which results in no liability for the undisclosed principal). The commentary states that the distinction between these two categories is "one of degree." Comment a:

> [T]he number of acts to be performed in accomplishing an authorized result, the number of people to be dealt with, and the length of time needed to accomplish the result are the important considerations. Continuity of service rather than the extent of discretion or responsibility is the hall-mark of the general agent. The point at which one becomes a general agent can not be marked with exactitude. One who is an integral part of a business organization and does not require fresh authorization for each transaction is a general agent.

Applying these criteria, I conclude that Fidelity was a general agent for FHLMC with respect to servicing the loans it sold to

2. One bankruptcy court has found no agency relationship between FHLMC and a seller of notes like Fidelity. *In re Ellis,* 152 B.R. 211, 217–18 (Bankr.E.D.Tenn.1993). *Ellis* did not deal with the servicing relationship, however, but only with the purchase and sale of notes, a subject on which I am in agreement with the bankruptcy court, as reflected in my earlier summary judgment decision. A second court, the Seventh Circuit, observed in *Mendrala v. Crown Mortgage Co.,* 955 F.2d 1132, 1141 (7th Cir.1992), that a seller of loans to FHLMC "was an 'independent contractor' and 'not [FHLMC's] agent or assignee.' " This statement was made in the context of considering the *Merrill* doctrine that estoppel may not be used against the government. The dictum is broad; it appears, however, that the court did not give close attention to agency law principles and simply accepted the self-serving assertions in the FHLMC Sellers' and Servicers' Guide.

FHLMC. A huge number of acts must be performed in servicing a loan and mortgage of many years duration. Although only one debtor needs to be dealt with, there are taxing authorities and insurance companies and, in a case like this, potential lienholders who are performing improvements to the property. The length of time is substantial for most home mortgages—here the mortgage term was thirty years. Although FHLMC has argued that its Sellers' and Servicers' Guide posed very severe limitations on what Fidelity could do, the *Restatement* commentary makes clear that "continuity of service" is the key, not the "extent of discretion or responsibility." As servicer, Fidelity became an integral part of FHLMC's administration of its secondary mortgage portfolio. Certainly, fresh authorization was not required for each element of the servicing relationship. Moreover, this was not a one-time event for Fidelity and FHLMC. Fidelity sold 221 loans to FHLMC from 1985 until its bankruptcy and was servicing some 109 loans for FHLMC when it was terminated on October 27, 1992.

I conclude, therefore, that under the *Restatement (Second) of Agency*, Fidelity must be considered a general agent and that FHLMC, as an undisclosed principal, is subject to liability on agency law principles for Fidelity's breaches of contract. I do not profess to understand all the policy reasons for why the *Restatement* drafters reached their liability conclusion for undisclosed principals from common law developments. The commentary unhelpfully states that the rule is an example of "inherent agency power." *Restatement* § 194 cmt. a. *Restatement* § 8 A defines "inherent agency power" as a term used to "indicate the power of an agent which is derived not from authority, apparent authority or estoppel, but solely from the agency relation and exists for the protection of persons harmed by or dealing with a servant or other agent." Comment a to section 8 A states:

> A principle which will explain [the] cases can be found if it is assumed that a power can exist purely as a product of the agency relation. Because such a power is derived solely from the agency relation and is not based upon principles of contracts or torts,

the term inherent agency power is used to distinguish it from other powers of an agent which are sustained upon contract or tort theories.

Moreover,

> [t]he common law has properly been responsive to the needs of commerce, permitting what older systems of law denied, namely a direct relation between the principal and a third person with whom the agent deals, even when the principal is undisclosed.... It would be unfair for an enterprise to have the benefit of the work of its agents without making it responsible to some extent for their excesses and failures to act carefully.

It seems to be this last factor that justifies the result the *Restatement* principles produce in this case. As a matter of agency law, it would be unfair for FHLMC to have the benefit of Fidelity's servicing of the note and mortgage without also making FHLMC responsible for Fidelity's excesses and failures. Dupuis always had reason to believe that whatever defaults had been committed by Fidelity could be used by her in defense against any action Fidelity might bring against her. The surprise was FHLMC's appearance, arguing that it was free of the Fidelity albatross.

### (b) *Merrill* Doctrine

■ Despite FHLMC's liability at common law (federal or Maine), I conclude that the *Merrill* doctrine ultimately provides a complete defense to FHLMC on all of Dupuis's contract claims.

In *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), the United States Supreme Court held that, regardless of the harsh effect on an innocent citizen, an agent representing the Federal Crop Insurance Corporation could not bind the corporation beyond his actual authority. Here, it is undisputed that Fidelity's wrongful acts as an agent were explicitly contrary to and prohibited by FHLMC's Sellers' and Servicers' Guide. Thus, if FHLMC is entitled to *Merrill* protection like the Federal Crop Insurance Corporation in *Merrill*, FHLMC cannot be liable to Dupuis.

The Supreme Court has identified a very broad scope for the *Merrill* doctrine:

> Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it. The Government may carry on its operations through conventional executive agencies or through corporate forms especially created for defined ends. Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.

332 U.S. at 383–84, 68 S.Ct. at 3 (citation omitted). FHLMC is one of the forms in which Congress has chosen to function. Congress established FHLMC in 1970 to implement an important government policy, creation of a secondary market for home mortgages. 1970 U.S.C.C.A.N. 3488, 3495. Congress made FHLMC exempt from federal, state and local taxes, 12 U.S.C. § 1452(d) (1970) (amended 1989), and FHLMC's Board of Directors consisted of three members of the Federal Home Loan Bank Board, all of whom were appointed by the President, 12 U.S.C. § 1452(a) (1970) (amended 1989). Although initially chartered with many governmental attributes, FHLMC was largely privatized in 1989. Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, s. 731, 103 Stat 430 (codified at 12 U.S.C. §§ 1811–1833e); *see also Liberty Mortgage Banking, Ltd. v. Federal Home Loan Mortgage Corp.*, 822 F.Supp. 956, 958 (E.D.N.Y.1993). But the President still appoints five of its eighteen board members, 12 U.S.C. § 1452(a)(2)(A), the Department of Housing and Urban Development and the Treasury Department continue to have regulatory oversight, 12 U.S.C. §§ 1452(b), 1455(j), and FHLMC continues to serve the objectives of its original charter, 12 U.S.C. §§ 1451–55. Thus, it continues to be a "corporate form[ ]" "especially created" by Congress "for defined ends." Although *Merrill* rejected estoppel principles arising out of apparent authority whereas I have concluded that the issue here is one of inherent (not apparent) authority, the primary factor that drove the conclusion in *Merrill* is equally applicable: Congress's ability to impose limits on what its creations may do. 332 U.S. at 385, 68 S.Ct. at 3–4. Congress established the FHLMC with specific powers, and the FHLMC has within those powers explicitly limited the authority of its agents. *Merrill* directs that a court must observe these limitations. *Id.; accord Mendrala v. Crown Mortgage Co.*, 955 F.2d 1132, 1140–41 (7th Cir.1992).[3] Although it is undoubtedly hard on Dupuis to subject her to this consequence—especially where she was unaware of FHLMC's involvement—that is the consequence of the *Merrill* principle. Accordingly, I conclude that Dupuis is unable to recover on any of her contract claims against FHLMC for Fidelity's actions.

**BREACH OF THE DUTY OF GOOD FAITH AND/OR FAIR DEALING (COUNT II), VIOLATION OF 9–A M.R.S.A. § 9–305 (COUNT VII) AND NEGLIGENCE (COUNT VIII)**

I find against Dupuis on her three remaining claims for recovery for the following reasons.

■ *Merrill* provides a defense to the alleged breach of the duty of good faith and/or fair dealing in Count II.

■ In Count VII, I find no civil recovery available under the Maine Consumer Credit Code for the failure to pay interest on the tax and insurance escrow. Although 9–A M.R.S.A. § 9–305 requires that the debtor receive the interest earned on such an escrow, the remedies and penalties part, sections 9–401 through 9–407, provides no remedies except the criminal penalty remedy of

---

**3.** I observe that later decisions seem to characterize the *Merrill* doctrine as based primarily upon protection of the federal Treasury, *see, e.g., Office of Personnel Management v. Richmond*, 496 U.S. 414, 420, 110 S.Ct. 2465, 2469, 110 L.Ed.2d 387 (1990), and that concern seems misplaced or at least highly attenuated here now that FHLMC is privately owned. Although focusing on that concern, none of the cases has suggested any limitation to the broad scope announced in *Merrill*. Consequently, if there is to be some narrowing, it must be left for an appellate court to pronounce.

section 9–407. The closest civil remedy is sections 9–405(2) and (3), which talk about a right to a refund when a debtor has paid an excess charge. Dupuis did not pay any excess charge here. Instead, Fidelity simply failed to pay interest on the escrow. I conclude that any remedy for that violation is to be pursued by the Attorney General under the criminal law or by enforcement activities through the appropriate state agency.

Finally, on Dupuis's claims of negligence against FHLMC in Count VIII for Fidelity's actions in administering the loan, selecting a contractor, supervising the renovation and failing to disburse loan proceeds, I find that Dupuis has failed to meet her burden of proof to persuade me as the factfinder that any such negligence occurred. On the stipulated record, I find insufficient evidence to persuade me of negligence.

Accordingly, judgment shall be entered for the defendant on all remaining counts of the Complaint.

### COUNTERCLAIM

The parties have not stipulated the record for purposes of the counterclaim, but they have briefed and argued whether FHLMC can be a holder in due course of the note and mortgage. On Dupuis's direct claim for damages in her complaint against FHLMC the answer is immaterial; holder-in-due-course status permits the holder of an instrument to recover against the obligor free of defenses the obligor might otherwise have, but it does not speak to what claims the obligor may have against the holder. Thus, whether FHLMC is a holder in due course does not alter its potential liability, as an undisclosed principal, for Fidelity's various breaches under the agency principles I have discussed.

■ It does, however, have a conclusive effect on Dupuis's affirmative defenses to FHLMC's counterclaim to enforce the note and mortgage, and since the parties have addressed the issue, I will resolve it. I am satisfied from the stipulated record that

FHLMC was a holder in due course, 11 M.R.S.A. §§ 3–302, 3–305,[4] on August 9, 1990, when it bought the note from Fidelity. At that time, FHLMC had no notice or information concerning the withholding of the $6,000 performance escrow or the $30,997.56 home improvement escrow. As of that date, therefore, FHLMC could have recovered the entire amount of the note from Dupuis. 11 M.R.S.A. § 3–305.

■ Dupuis argues that FHLMC nevertheless should not be considered a holder in due course because of its close connection to Fidelity. Typically, the so-called close connection cases eliminate the broad rights of a holder in due course in installment sales where the seller has set up a separate financing agency to hold the commercial paper produced through the sale and to avoid any defenses that might be available for a defective product or other failure to perform. *See, e.g., Unico v. Owen,* 50 N.J. 101, 232 A.2d 405 (1967). Those circumstances do not exist here. As I found in my order on summary judgment, Fidelity was not FHLMC's agent for purposes of *obtaining* and *closing* (as contrasted with *servicing*) the loan. FHLMC simply establishes standards pursuant to which it offers to purchase loans and mortgages from lenders throughout the country. It thereby creates a secondary market. There is no interrelationship of personnel, owners or otherwise between the lenders and FHLMC. Furthermore, this is not an instance where an entrepreneur is selling a product and seeks to unbundle the financing part of what is otherwise a unitary transaction.

■ Therefore, although Fidelity ultimately misbehaved in failing ever to pay out the $6,000 performance escrow or the remaining amount of the home improvement escrow or to transfer those funds to FHLMC and reduce the amount due from Dupuis, FHLMC as a holder in due course can collect the face amount of the note it purchased and accruing interest in accordance with the note's terms. Thus, Fidelity's failure to disburse the escrows is not a viable affirmative

---

4. Although Article 3 of the Uniform Commercial Code was repealed by 1993 Me. Laws, c. 293 and replaced by Article 3–A of Title 11, this repeal did not take effect until after this case was filed, and therefore the former Article 3 governs this case. *See* 1 M.R.S.A. § 302.

defense for Dupuis on FHLMC's counter-claim to enforce the note and mortgage.

Accordingly, Dupuis shall show cause within ten (10) days why judgment should not be entered for FHLMC on the counterclaim.

So Ordered.