Walter D. PASLOWSKI and Janice F. Paslowski, his wife, individually and on behalf of all others similarly situated Plaintiffs,

v.

STANDARD MORTGAGE CORPORATION OF GEORGIA, Three Rivers Bank & Trust Company and Federal Home Loan Mortgage Corp., Defendant.

No. CIV. A. 98–679.

United States District Court, W.D. Pennsylvania.

Aug. 14, 2000.

Michael P. Malakoff, Erin M. Brady, Malakoff, Doyle & Finberg, Pittsburgh, PA, for Walter D. Paslowski.

Stanley Yorsz, Buchanan Ingersoll, Pittsburgh, PA, for Standard Mortgage Corp. of Georgia, Three Rivers Bank & Trust Co.

## OPINION

DIAMOND, District Judge.

Presently before the court is a motion to dismiss plaintiffs' amended class action complaint [1] pursuant to Fed.R.Civ.P. 12(b)(6) filed by defendant Federal Home Loan Mortgage Corp. ("Freddie Mac" or "FHLMC"). For the following reasons,

the motion will be granted, and all claims against Freddie Mac will be dismissed.

### Standard of Review

Under Fed.R.Civ.P. 12(b)(6), a plaintiff's complaint must be dismissed for failure to state a claim if a defendant demonstrates "beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In ruling on a 12(b)(6) motion, the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir.1994). Moreover, in assessing motions to dismiss, courts must be cautious, "particularly where granting such a motion would terminate the litigation before the parties have had their day in court." *Kiser v. General Electric Corp.,* 831 F.2d 423, 427 (3d Cir. 1987), *cert. denied,* 485 U.S. 906, 108 S.Ct. 1078, 99 L.Ed.2d 238 (1988).

### Factual Background

On March 22, 1974, plaintiffs, Walter Paslowski and his wife Janice Paslowski (the "Paslowskis"), entered into a mortgage agreement with South View Savings & Loan Association ("South View") obligating them to repay $26,000.00 for a loan at an interest rate of 8.5% per annum. Complaint ¶ 10. Contemporaneously, the Paslowskis executed a bond with South View. *Id.* The mortgage agreement and bond required the Paslowskis to repay their mortgage debt in 300 monthly payments of $210.00 for principal and interest over the course of 25 years. *Id.* at ¶ 11. In addition to the monthly payment for interest or principal, the Paslowskis were required under the mortgage and bond to pay South View monthly installments

1. The court notes that plaintiff's motion for class certification is pending and a determination of whether this litigation will proceed as a class action has not been made at this juncture.

equal to one-twelfth of the annual real estate taxes levied on the property. *Id.* at ¶ 12.[2]

In late 1983, Community Savings Association ("Community") acquired the Paslowskis' mortgage and other South View mortgages when it consolidated with South View. *Id.* at ¶ 17. On April 1, 1987, Freddie Mac[3] purchased the Paslowskis' mortgage and other Community mortgages. *Id.* at ¶. 19. Although Freddie Mac purchased the mortgage loan, Community, pursuant to a "seller/servicer" agreement with Freddie Mac, continued to control all aspects of the mortgage servicing operations of the Paslowskis' mortgage until November 15, 1994, when Freddie Mac entered into a seller/servicer agreement with Standard Mortgage Corporation of Georgia ("Standard"), to service the Paslowskis' mortgage.[4]

On September 8, 1998, the Paslowskis fully prepaid their mortgage which was satisfied on November 10, 1998. *Id.* at ¶ 22.

Plaintiffs' amended complaint challenges numerous aspects of the mortgagees' administration of the mortgage loan agreement. First, the complaint alleges that South View breached its contractual obligations contained in the loan documents by ceasing to capitalize its mortgagors' bill payments and instead establishing tax and insurance "escrow" accounts into which it placed monthly bill payments belonging to the Paslowskis and other mortgagors, which it later removed to pay bills when they became due. *Id.* at ¶ 26. The complaint alleges that Community continued this improper practice of placing bill payments in escrow rather than capitalizing them, and that, in 1984, Community began paying mortgagors interest at the rate of 1½% on money held in escrow, a rate significantly lower than the effective rate of interest under capitalization. *Id.* at ¶ 28. The complaint alleges that these practices continued after Freddie Mac purchased the loan in 1987. *Id.* at ¶ 29.

Second, the complaint alleges that, on numerous occasions, South View and its successors underestimated the total annual costs of the Paslowskis' tax bill, so that their payments were insufficient. To cover the shortfalls in the tax payments, the complaint alleges that South View and its successors loaned money to the Paslowskis and added the loans to their mortgage debt, without giving them any notice as required under the loan documents or an opportunity to cover the shortfalls. *Id.* at ¶¶ 31–36.

Third, the complaint alleges that South View, Community, and Freddie Mac charged the plaintiffs interest on loan advances for time periods that predated the date of distribution. *Id.* at ¶¶ 37–39.

Fourth, the complaint alleges that after Standard began servicing Freddie Mac mortgages in 1994, it failed to pay Community mortgagors interest until March of 1996 for interest that had accrued during 1995 on money held in escrow, in violation of Community's 1984 agreement to pay escrow interest to its mortgagors "at year end, and on a yearly basis thereafter." *Id.* at ¶ 41.

---

**2.** The mortgage also provided South View with discretion to bill the Paslowskis monthly for ¹⁄₁₂ of the annual cost of insuring the mortgaged property against fire and other hazards. However, the Paslowskis were never billed for insurance because they paid their insurer for sufficient insurance throughout the term of the mortgage. *Id.* at ¶ 14.

**3.** Freddie Mac is a federally chartered, sponsored, and regulated corporation that purchases home mortgages from lenders and sells securities to the public to fund the purchases. Mortgages are only purchased from, and serviced by, approved seller/servicers under the terms of contracts authored by Freddie Mac. *See* 12 U.S.C. § 1451 *et seq.; Hudson United Bank v. LiTenda Mortgage Corp.,* 142 F.3d 151, 153 n. 1 (3d Cir.1998).

**4.** In 1997, Community was consolidated into Three Rivers Bank & Trust Company. Complaint, ¶ 8. By that time, however, Standard was servicing the Paslowskis' mortgage for Freddie Mac. *Id.* at ¶ 9.

Finally, the complaint alleges that the defendants concealed from plaintiffs the fact that Freddie Mac acquired their mortgage in 1987. *Id.* at ¶ 43.

Based on the foregoing allegations, the complaint asserts eight causes of action, six of which name Freddie Mac as defendant.[5] Count I asserts a claim for breach of contract based on the failure to "capitalize" mortgagor's tax and insurance payments, by over billing mortgagors to maintain the tax and insurance escrow accounts, and by paying lower interest on the escrowed bill payments. Count II asserts a breach of contract claim for adding loan advances to unpaid mortgage balances without notice, for charging interest for loan advances predating the date of disbursement, and for untimely payment of interest accruing in 1995 on money held in escrow. Count III asserts a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201–1 *et seq.* (the "CPL"), based on false representations that the mortgage contracts authorized the placement in escrow of bill payments made by mortgagors and that the mortgagors could be charged for the maintenance of those escrow accounts. Count IV also asserts a claim under the CPL based on the mortgagees' concealment of the fact that they added loan advances to plaintiff's unpaid mortgage balances without notice, and that they charged plaintiffs interest for loan advances that predated the dates in which the loan advances were disbursed. Count V alleges a violation of the CPL based on concealment of the fact that Freddie Mac was the owner of the mortgages. Finally, Count VII asserts a claim for breach of fiduciary duty premised upon the alleged contractually unauthorized practices. In all six counts in which Freddie Mac is named as a defendant, plaintiffs assert that Freddie Mac is both directly liable and liable as a successor-in-

interest for the conduct of South View and Community.

*Analysis*

Freddie Mac first argues that it cannot be held liable for any conduct engaged in by South View and/or Community prior to Freddie Mac's acquisition of the Paslowskis' mortgage in 1987 because Freddie Mac is not a "successor-in-interest" in regard to the mortgage contract. Additionally, Freddie Mac argues that, as a federal instrumentality, it cannot be held liable for unauthorized conduct engaged in by its servicers, Community and/or Standard, after Freddie Mac acquired plaintiffs' mortgage in 1987. The court agrees with Freddie Mac on both of these positions.

■■■ Much of the conduct alleged in the complaint was engaged in by either South View or Community prior to Freddie Mac's acquisition of the mortgage loan in 1987. Plaintiffs seek to hold Freddie Mac liable for this conduct under a theory of "successor" liability. Apparently, plaintiffs' position is that simply by purchasing the mortgage Freddie Mac thereby assumed responsibility for any and all breaches or other wrongful conduct committed by any and all prior owners of the loan. Plaintiffs offer no legal support for this sweeping assertion. In fact, the term "successor-in-interest" is an inaccurate description of Freddie Mac's status vis-a-vis South View and Community in this case. Here, South View, the original mortgagee, consolidated with Community in 1983. At that point, Community became the mortgagee of the Paslowskis' mortgage. In 1987, Community transferred its right to receive payments on the obligations secured by the mortgage to Freddie Mac through an assignment of Community's interest. Thus, rather than being a successor-in-interest, Freddie Mac's status in re-

---

**5.** Freddie Mac is not named as a defendant in Count VI or Count VIII of plaintiffs' amended class action complaint.

lation to Community in this case is as an assignee of the mortgage rights.[6]

■ Although Community assigned its mortgage rights to Freddie Mac, a distinction in law is made between the assignment of rights and the delegation "or assumption" of *duties*. Restatement (Second) of Contracts, § 316 (1979). " 'Merely as assignee one does not become affirmatively liable for a deficit in accounts between his assignor and the other party to the assigned contract. Any such liability would have to be based upon an affirmative assumption, by the assignee, of the obligations of his assignor on the contract, or upon some independent contractual arrangements.' " *United States v. Thompson and Georgeson, Inc.*, 346 F.2d 865, 869 (9th Cir.1965); *Lachmar v. Trunkline LNG Co.*, 753 F.2d 8, 9–10 (2d Cir.1985) (assignee of rights under a bilateral contract is not bound to perform the assignor's duties under the contract unless he expressly assumes to do so) (applying New York law). Thus, an assignee is liable only for past breaches if he has "expressly assumed any duties correlative with the right assigned, there being no implication of assumption by the mere assignment." *Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1018 (D.C.Cir.1985) (*quoting Rittenberg v. Donohoe Construction Co.*, 426 A.2d 338, 341 (D.C.1981)) (applying District of Columbia law).

■ Here, there is no allegation that Freddie Mac affirmatively assumed all obligations and consequences of mortgage contracts entered into between South View and Community and its mortgagors. In fact, § 1.2(a) of the standard Freddie Mac Single–Family Sellers and Servicers Guide (the "Guide"), which governs the contractual relationship between Freddie Mac and all of its sellers/servicers, expressly provides that the seller "must service all mortgages which the seller has sold to Freddie Mac." [7] Thus, by placing the onus of servicing the mortgage on the seller, the Guide itself establishes that the contractual *duties* relating to the servicing of the mortgage are retained by the assignor and are not delegated to Freddie Mac. Accordingly, Freddie Mac cannot be held liable for any breaches or other misconduct relating to the Paslowskis' mortgage contract which were committed by Community or South View prior to the assignment of mortgage rights to Freddie Mac in 1987. Thus, to the extent that plaintiffs' complaint raises claims asserting "successor" liability against Freddie Mac for conduct committed by South View and/or Community prior to 1987, those claims are dismissed.

■ For the same reason, plaintiffs' claim against Freddie Mac for breach of fiduciary duty likewise must be dismissed. Count VII of plaintiffs' complaint alleges that South View, Community, and Freddie Mac were trustees of plaintiffs with respect to bill payments belonging to the plaintiffs and that those three entities breached their fiduciary duty by engaging in contractually unauthorized practices in regard to those payments. However, plaintiffs have failed to allege any facts which would demonstrate the existence of a fiduciary relationship between Freddie Mac and the plaintiffs. Assuming a trust

6. A mortgagee's rights to receive payment on the obligation secured by the mortgage and to foreclose if the mortgagor defaults are transferable without limitation through an assignment. 4 Powell on Real Property, § 37.27. Assignments of mortgage rights to main secondary market participants such as Freddie Mac are "regular occurrence[s]." *Id.*

7. The applicable provisions of the Guide are attached to defendants' memorandum, *see* Ap-pendix to Defendants' Memorandum of Law in Support of its Motion to Dismiss. At page 12 of its brief in opposition to Freddie Mac's motion to dismiss, "plaintiffs agree that Freddie Mac's relationship with its servicers is governed by its servicer guide." Accordingly, the Guide will be considered by the court in ruling on defendants motion to dismiss under 12(b)(6).

relationship existed,[8] it was created in the original mortgage contract between South View and plaintiffs. Even assuming a fiduciary relationship existed between South View and plaintiffs, that duty did not transfer automatically to Freddie Mac by virtue of the assignment of the mortgage rights from Community, South View's successor, to Freddie Mac. Instead, that fiduciary duty could be delegated to Freddie Mac only by virtue of some affirmative act. However, Freddie Mac did not control the plaintiffs' escrow account. Rather, control of the escrow account, as well as all other duties related to the servicing of the mortgage, remained with Community under the terms of Freddie Mac's purchase documents. Thus, if a fiduciary duty existed between plaintiffs and South View and Community, such a duty was not expressly delegated to nor assumed by Freddie Mac when it purchased the mortgage. Accordingly, plaintiffs' complaint fails to allege a fiduciary relationship between Freddie Mac and plaintiffs, and therefore, Count VII of plaintiffs' amended complaint raising a claim against Freddie Mac for breach of fiduciary duty must be dismissed.[9]

■■■■ Plaintiffs' amended complaint also asserts liability against Freddie Mac for conduct occurring after its acquisition of Community's mortgages in 1987. Although plaintiff asserts direct liability against Freddie Mac, the complaint fails to make a single allegation of any affirmative act committed by Freddie Mac itself. Freddie Mac operates solely in the secondary market and is not involved in any way in the servicing of the mortgage loans [10] which it purchases from originating lenders. *Hashop v. FHLMC*, 171 F.R.D. 208, 210–11 (N.D.Ill.1997). Rather, Freddie Mac contracts with either the loan originator or another party to service the loans that they purchase, and Freddie Mac exclusively relies on the loan servicers to control all aspects of the mortgage servicing operations. *Id.* Thus, the only means by which Freddie Mac could be held liable for post–1987 breaches or other wrongful conduct relating to the loans would be through vicarious liability for the actions of its servicers: first Community, then Standard. However, the court finds that Freddie Mac is protected from liability for its servicers' breaches or other wrongful conduct under the *Merrill* doctrine.

The *Merrill* doctrine is based on the United States Supreme Court's decision in *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). In that case, agents of the Federal Crop Insurance Corporation ("FCIC") erroneously had informed plaintiffs that their wheat crop was insurable. The Court, however, held that since the FCIC was a federal instrumentality it could not be bound by its agent's misrepresentations beyond the scope of his authority, nor

**8.** The court is not deciding whether a fiduciary relationship existed between plaintiffs and South View or Community. However, for purposes of Freddie Mac's motion to dismiss only, the court will accept plaintiffs' allegations as true and assume that such a relationship did exist.

**9.** To the extent Count VII seeks to hold Freddie Mac liable for its servicers' breach of any fiduciary duty owed to plaintiffs *by the servicers*, it must be dismissed under the *Merrill* doctrine as discussed *infra*. A federal instrumentality cannot be held liable for a breach of duty by its servicers that it has not expressly authorized. *See Hinton v. FNMA*, 945 F.Supp. 1052, 1060 (S.D.Tx.1996) (FNMA not liable for its servicers' alleged breach of duty of good faith and fair dealing). Because it is

the sellers/servicers that would have to exercise any fiduciary duties that might exist, their failure to do so would not generate any liability in Freddie Mac under the *Merrill* doctrine. *See Deerman v. FHLMC*, 955 F.Supp. 1393, 1400 (N.D.Ala.1997), *aff'd*, 140 F.3d 1043 (11th Cir.1998).

**10.** "Mortgage servicing consists primarily of collecting the borrower's payments, maintaining all of the necessary accounts (including an escrow account for taxes and insurance) and making the necessary disbursements (including remittance of principal and interest to the FHLMC and disbursements for tax and insurance)." *Deerman v. FHLMC*, 955 F.Supp. 1393, 1396 (N.D.Ala.1997), *aff'd*, 140 F.3d 1043 (11th Cir.1998).

estopped from enforcing its crop insurance requirements.

Since *Merrill*, the doctrine that the government cannot be estopped or bound by the unauthorized acts or conduct of its agents or its employees has been widely applied in a variety of contexts. For example, it is well-settled that "only those with specific authority can bind the government contractually; even those persons may do so only to the extent that their authority permits." *Gardiner v. Virgin Islands Water & Power Authority*, 145 F.3d 635, 644 (3d Cir.1998). This judicial reluctance to bind the government by its agent's unauthorized conduct is based upon numerous considerations including sovereign immunity, separation of powers and public policy. *Lovell Manufacturing v. Export–Import Bank of United States*, 777 F.2d 894, 898 (3d Cir.1985). As recently as 1990, the Supreme Court reiterated its continuing reluctance to estop or to bind the government by unauthorized acts. *Office of Personnel Management v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387, (1990).[11]

"While the *Merrill* doctrine erects a high wall ... it does so only to protect governmental entitites." *REW Enterprises, Inc. v. Premier Bank, N.A.*, 49 F.3d 163, 167 (5th Cir.1995). In determining whether an entity is governmental for purposes of the *Merrill* doctrine, courts have focused exclusively upon the entity's function as evidenced by congressional intent. "Whether an entity is governmental for purposes of estoppel does not turn on its label, such as agency, instrumentality, or private corporation, but rather on congressional intent." *Id.; Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.*, 72 F.Supp.2d 547, 556 (W.D.Pa. 1999). "[C]lassification as a government entity in [the *Merrill* ] context turns on whether estoppel would thwart congressional intent." *Mendrala v. Crown Mortgage Co.*, 955 F.2d 1132, 1140 (9th Cir. 1992).

For *Merrill* purposes, Freddie Mac clearly is "governmental." Congress created Freddie Mac with the intent to further an important governmental objective: to create, and provide stability in, a secondary market for residential mortgages. *See* 12 U.S.C. § 1451 note; 12 U.S.C. § 4501. "The congressional purposes for Freddie Mac are clearly designed to serve the public by increasing the availability of mortgages on housing for low-and-moderate-income families and by promoting nationwide access to mortgages." *American Bankers Mortgage Corp. v. FHLMC*, 75 F.3d 1401, 1406–07 (9th Cir.1996).

Federal courts consistently have recognized that Freddie Mac was created by Congress with an intent to further an important governmental objective and thus qualifies as governmental for *Merrill* purposes. *Mendrala*, 955 F.2d at 1140; *Deerman*, 955 F.Supp. at 1400; *Dupuis v. Federal Home Loan Mortgage Corp.*, 879 F.Supp. 139, 144 (D.Maine 1995); *Siradas v. Chase Lincoln First Bank*, 1999 WL 787658 (S.D.N.Y. Sept.30, 1999). This court agrees and finds that Freddie Mac is a federal instrumentality that is entitled to

---

**11.** The Supreme Court has never directly decided the issue of whether there might be some situation where estoppel against the government could be appropriate, but has raised doubts as to whether estoppel would be appropriate against the government under any circumstances. Although suggesting in dicta on several occasions that such a situation could arise, the Court nevertheless has stressed that it has reversed every finding of estoppel that it has reviewed. *Richmond*, 496 U.S. at 421–22, 110 S.Ct. 2465. In the absence of direct guidance from the Supreme Court on the issue, the Third Circuit continues to adhere to the position that estoppel may lie against the government if the defendant can establish affirmative misconduct on the part of government officials. *United States v. Asmar*, 827 F.2d 907, 911 n. 4 (3d Cir.1987); *United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir.1992). Here, however, there are no allegations of any affirmative misconduct on the part of Freddie Mac, nor could there be, as Community and Standard controlled all aspects of the servicing of Freddie Mac's mortgages, and their conduct, as alleged, was outside the scope of their express authority.

protection under the *Merrill* doctrine from liability for the unauthorized acts of its sellers/servicers.

 Plaintiffs contend, however, that the *Merrill* doctrine is inapplicable in this case for numerous reasons, none of which the court finds persuasive. First, plaintiffs contend that Freddie Mac cannot be deemed a federal instrumentality based on the test set forth in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995). In *Lebron*, the Court stated that a corporation is a part of the government for constitutional purposes where the government creates the corporation by special law for the furtherance of governmental objectives *and* controls the corporation by retaining for itself permanent authority to appoint a majority of the corporation's directors. *Id.* at 400, 115 S.Ct. 961.

 Plaintiffs contend that Freddie Mac does not satisfy the second prong of the *Lebron* test, and thus cannot be deemed a "federal instrumentality." However, plaintiffs reliance on *Lebron* is misplaced. *Lebron* involved the issue of whether a corporation is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the government by the Constitution. The threshold consideration for invoking federal constitutional protection is whether federal governmental action is involved, as purely private action does not trigger any constitutional protections. *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 542, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987). Under *Lebron*, in order to show that an

entity is engaged in federal action, it is necessary to establish not only that the entity has a governmental objective but also that the government exercises control over it to the extent that it can be said that the entity is acting as the government for constitutional purposes.

Conversely, the *Merrill* doctrine involves the distinct concept of whether a federal instrumentality should be bound by the unauthorized acts of its agents and is based on broader considerations involving separation of powers and public policy. *Mendrala*, 955 F.2d at 1140. In this context, the sole test is whether the entity is engaged in a governmental objective, and whether the government "controls" the entity is irrelevant. *See, e.g., American Bankers*, 75 F.3d at 1408. Here, as noted, Freddie Mac clearly has a governmental objective. In fact, plaintiff concedes that Freddie Mac's objectives are governmental. Plaintiff's Brief in Opposition at p. 10 ("Freddie Mac satisfies the first prong of the [*Lebron*] test."). For *Merrill* purposes, that is where the inquiry ends.

Plaintiff has not cited, nor has the court found, a single case applying the *Lebron* test in the *Merrill* context. The one case cited by plaintiffs which relied upon *Lebron* is not relevant to this case because it likewise involved the issue of whether Freddie Mac is a governmental entity for *constitutional* purposes. *American Bankers*, 75 F.3d at 1409. Although the court determined that Freddie Mac is not a federal entity for constitutional purposes,[12] it did so by finding that Freddie Mac was not *controlled* by the government to such an extent that it was engaging in federal action for constitutional purposes.[13] *Id.*

**12.** A finding that Freddie Mac is not a governmental entity for constitutional purposes does not preclude a determination that Freddie Mac *is* a federal instrumentality for *Merrill* purposes, because an entity simultaneously can be a federal instrumentality for some purposes but not a federal agency or entity for others. *See Mendrala*, 955 F.2d at 1139 ("conclusion that FHLMC is not a 'federal agency' for purposes of [Federal Tort Claims Act] does not preclude a determination that it is a federal instrumentality for other pur-

poses, including purposes of estoppel and the *Merrill* doctrine"); *Paley v. FHLMC*, 1994 WL 327659 (E.D.Pa. July 7, 1994) (finding *Liberty Mortgage v. Federal Home Loan Mort.*, 822 F.Supp. 956 (E.D.N.Y.1993) irrelevant to issue of whether punitive damages could be awarded against federal instrumentality).

**13.** Importantly, as to the first prong of the *Lebron* test, the court found that Freddie Mac does engage in governmental objectives and noted that Freddie Mac's federal mission was

This case, however, involves Freddie Mac's status as a federal instrumentality for *Merrill* purposes, not constitutional purposes, and thus, *Lebron* and its progeny are not applicable to this case.

 Plaintiffs also argue that the *Merrill* doctrine cannot be applied to protect Freddie Mac because Freddie Mac was restructured as a privately controlled and owned corporation under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1451 *et seq.* Plaintiff contends that, as a privately owned and controlled enterprise, Freddie Mac is no longer a governmental entity entitled to the protection of the *Merrill* doctrine. However, FIRREA did not transform Freddie Mac into a purely private entity, but rather reorganized it as a "government sponsored private corporation" which retains numerous governmental attributes. For instance, Freddie Mac still has five of its 18 board members appointed by the President, and is subject to continuing oversight by the Department of Treasury and the Department of Housing and Urban Development. 12 U.S.C. §§ 1452(a)(1), (b)(2), (d), (h)(2); § 1459(c), (e), & (f). Freddie Mac is required to submit annual reports to the United States House of Representatives and United States Senate (§ 1452(h)) and is exempt from state and local taxation (§ 1452(e)). Cases against Freddie Mac are deemed to arise under federal law and may be removed to federal court. § 1452(f). Most importantly, however, Freddie Mac retains under FIRREA its congressional purpose to create a secondary market for residential mortgages. 12 U.S.C. § 1451 note; 12 U.S.C § 4501; *American Bankers,* 75 F.3d at 1406–07.

Although Freddie Mac now is a privately controlled corporation under FIRREA, "a federal instrumentality does not divest itself of the privileges of instrumentality status when it acts more like a privately-

owned institution than a federal agency.' " *Paley, supra (quoting Smith v. Russellville Production Credit Association,* 777 F.2d 1544, 1550 (11th Cir.1985)). Rather, Freddie Mac still has at its core a public purpose established by Congress, which is to provide stability in, and to provide ongoing assistance to, a secondary market for home mortgages. *Mendrala,* 955 F.2d at 1140. "Holding the FHLMC responsible for the unauthorized actions of an entity such as [its seller/servicer] would thwart its congressional purpose." *Id.* at 1141. Because Freddie Mac retained its governmental objective, FIRREA did not alter Freddie Mac's status as a federal instrumentality entitled to the protection of the *Merrill* doctrine.

Plaintiffs also argue that FIRREA stripped Freddie Mac of governmental immunity by placing Freddie Mac under private ownership and control. Here, however, Freddie Mac is not alleging that it is entitled to governmental immunity from suit, but instead is arguing under the *Merrill* doctrine that it should not be held liable for the acts of its servicers that it had not expressly authorized. As the court in *Mendrala* noted, "while it is true that [the principle that estoppel does not lie against the government] once rested largely on considerations of sovereign immunity, it is distinct from that doctrine and is supported by its own independent rationales." *Mendrala,* 955 F.2d at 1139. The fact that Freddie Mac is no longer entitled to immunity from suit under FIRREA does not affect its entitlement to protection from liability for the unauthorized acts of its agents under *Merrill.*

 Finally, plaintiffs argue that because Freddie Mac now is privately controlled and owned under FIRREA, the policy underlying the *Merrill* doctrine, the protection of the public treasury, no longer is implicated. However, while the *Merrill* doctrine was designed in part to protect

sufficient to qualify Freddie Mac as governmental for *Merrill* purposes. *Id.* at 1407 (*citing Mendrala,* 955 F.2d at 1140–41). However, the court went on to say that *Mendrala* was irrelevant to the control prong of the *Lebron* test. *Id.* at 1408.

against "endless litigation over both real and imagined claims of misinformation by disgruntled citizens, imposing an unpredictable drain on the public fisc," (*Richmond*, 496 U.S. at 433, 110 S.Ct. 2465), it was not the sole policy behind the doctrine. As the court in *Dupuis* noted, "the primary factor that drove the conclusion in *Merrill* is ... Congress' ability to impose limits on what its creations may do." *Dupuis*, 879 F.Supp. at 145. The court further noted that Congress established Freddie Mac with specific powers, and Freddie Mac "has within those powers explicitly limited the authority of its agents. *Merrill* directs that a court must observe these limitations." *Id.* Other courts as well have recognized this second policy underlying the *Merrill* doctrine. *See McCauley v. Thygerson*, 732 F.2d 978, 982 (D.C.Cir.1984) (respect must be given for congressional intent within our constitutional system of allocated powers); *REW Enterprises*, 49 F.3d at 167 (estopping an agency from disavowing an unauthorized act would validate the agency's improper infringement on the authority of a coordinate branch). Accordingly, because the *Merrill* doctrine implicates policy considerations beyond protection of the public treasury, the fact that Freddie Mac now is privately owned under FIRREA is not grounds to deny Freddie Mac the protection of the *Merrill* doctrine.

■ Because Freddie Mac is a federal instrumentality entitled to the protection of the *Merrill* doctrine, it is not bound by the unauthorized acts of its sellers/servicers that it relies upon to service the mortgage that it owns. As approved Freddie Mac servicers, Community and Standard were governed by the terms of the Guide

and certain other "purchase documents" as defined in § 1.2(a) of the Guide.[14] Pursuant to § 1.2(a), a seller who sells mortgages to Freddie Mac or a servicer who contracts to provide services, is required to service those mortgages for Freddie Mac in accordance with the standards set forth in the Guide.

■ Here, the court finds that the alleged actions of Community and Standard occurred outside the scope of their express authority under the Guide. First, the complaint alleges in Counts III, IV and V that Freddie Mac's servicers engaged in conduct that violated the Pennsylvania CPL. Accepting plaintiff's allegations as true for purposes of this motion to dismiss, Freddie Mac's servicers violated the CPL by: (1) falsely representing that the South View mortgage authorized the placement of bill payments in escrow and that the mortgagors could be billed for maintenance of those accounts (Count III); (2) concealing that the servicers added loan advances to unpaid mortgages and charged interest for loan advances predating disbursement (Count IV); and (3) concealing that Freddie Mac was the owner of their mortgage (Count V).

However, Freddie Mac's seller/servicer guide expressly prohibits its sellers/servicers from engaging in any conduct that violates any applicable state or federal law. Section 53.8 provides that: "The Servicer agrees to comply with the following laws, regulations, and orders ... [7] All other applicable federal and state laws, regulations and orders." Section 51.4(a) of the Guide likewise mandates that "mortgages purchased by Freddie Mac must be serviced by a Servicer in accordance with the

14. Plaintiffs argue that the Guide does not have the legal effect of a federal statute or regulation, which plaintiffs contend are required to place them on notice of the risks incurred in dealing with a federal instrumentality. However, the gist of the *Merrill* doctrine is to preclude a federal instrumentality from being held liable for *unauthorized* acts of its agents. The Guide limits the authority of the sellers/servicers to act on Freddie Mac's

behalf. "Congress established the FHLMC with specific powers, and the FHLMC has within those powers explicitly limited the authority of its agents." *Dupuis*, 879 F.Supp. at 145. The Guide sets forth these limitations and the *Merrill* doctrine directs that these limitations be observed, even where plaintiffs are unaware of the limitations, or even unaware of Freddie Mac's involvement with their mortgage. *Id.*

requirements of applicable law and the Purchase Documents." More specifically, § 2.11 of the Guide expressly provides that "if a Borrower inquires about the ownership of his or her Mortgage, and Freddie Mac owns the Mortgage, the Seller/Servicer *must* inform the Borrower that Freddie Mac owns the Mortgage once the Borrower's identity is verified.".

Thus, by engaging in conduct that violated the Pennsylvania CPL, the servicers were acting outside the scope of their express authority under the Guide, which precludes Freddie Mac servicers from violating applicable state law. Accordingly, assuming that the servicers' conduct violated the Pennsylvania CPL, Freddie Mac, as a federal instrumentality protected by the *Merrill* doctrine, cannot be held liable for their unauthorized conduct. *See, e.g., Deerman,* 955 F.Supp. at 1400 (servicers' unauthorized failure to comply with New York Deceptive Acts and Practices law not a valid basis for recovery against Freddie Mac). Therefore, Counts III, IV and V alleging liability against Freddie Mac for its servicers' violations of the Pennsylvania CPL, are dismissed for failing to state a claim upon which relief can be granted.

■ Similarly, Freddie Mac cannot be held vicariously liable for its servicers' breaches of contract. Count I of plaintiffs' amended complaint alleges that the mortgage contract was breached by the failure to capitalize tax and insurance payments, by over billing to maintain tax and insurance escrow accounts, and by paying lower interest on bill payments held in escrow. Count II alleges that the mortgage contract was breached by the adding of loan advances to unpaid mortgage balances without notice, charging interest for loan advances predating the dates on which the loan advances were disbursed and failing to pay timely interest that accrued during 1995 on money held in escrow. Both breach of contract counts allege conduct that was engaged in by Freddie Mac's servicers not Freddie Mac itself. Neither count alleges a single affirmative act com-

mitted by Freddie Mac. Again it is the servicers not Freddie Mac, who administer the mortgage accounts. "[T]he servicers establish, maintain, compute, collect, adjust and disburse the escrow. FHLMC does not maintain information on whether an escrow account exists with any mortgage it has purchased nor does it maintain information on monthly payments, account balances or possible overages. *This information remains with the servicer." Hashop v. FHLMC,* 171 F.R.D. 208, 211 (N.D.Ill., 1997) (emphasis added). Accepting the allegations that the servicers breached the contract as true for purposes of this motion to dismiss, the conduct alleged in the complaint was outside the scope of the servicers' actual authority.

Section 59.1 of the Guide governs escrow for taxes, ground rents, assessments and other charges. The conduct alleged in the complaint violate § 59.1 in several respects. First, § 59.1 expressly provides that "if the amount held in escrow by the servicer, together with the future monthly installments of escrow, exceeds the amount required to pay charges as they fall due, the servicer must either repay the excess *promptly* to the borrower . . . or credit the excess to the borrower by a reduction in monthly escrow installments." Thus, to the extent plaintiffs' complaint alleges that the contract was breached by over billing to maintain tax and insurance escrow accounts, such conduct clearly is prohibited by § 59.1 and thus was outside the scope of the servicer's actual authority.

Likewise, § 59.1 provides:

If the amount held in escrow by the servicer is deemed insufficient to pay charges when due, the servicer should obtain the necessary additional funds from the borrower . . . or if there is insufficient time to obtain the amount, the servicer must pay any charges due and reflect the shortage in the borrower's *escrow account.* The servicer may either increase the borrower's next payment to cover all of the advance or schedule the repayment of such advance

over several months. The servicer may not collect the advance by deducting from one or more monthly mortgage payments.

Here, Count II of plaintiffs' amended complaint alleges that the servicer breached the contract by adding loan advances to unpaid mortgage balances and by charging interest for loan advances predating the date of disbursement. Such conduct clearly is in violation of the mandates of § 59.1 which provides that advances are to be covered either by increasing the borrower's next escrow payment or to schedule the repayment over several months. Thus, the servicers, by engaging in conduct prohibited by the Guide, acted outside the scope of their authority, and Freddie Mac cannot be held liable for their unauthorized conduct. *See, e.g., Dupuis,* 879 F.Supp. at 144 (*Merrill* doctrine provided complete defense for Freddie Mac on all of plaintiff's contract claims). Accordingly, Counts I and II alleging liability against Freddie Mac for their servicers' breaches of contract, are dismissed for failing to state a claim upon which relief can be granted.

The Supreme Court in *Merrill* stated that "[w]hatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." Here, that concept applies to preclude plaintiffs from holding Freddie Mac liable for the alleged breaches and misconduct committed by its servicers outside the scope of their authority as defined in the Guide.

Contrary to plaintiffs' assertions, the *Merrill* doctrine does not permit Freddie Mac to violate its contractual obligations with impunity. Had Freddie Mac itself engaged in or authorized the alleged conduct, it could be held responsible therefor. However, the breaches and misconduct alleged in plaintiffs' complaint were not committed by Freddie Mac, but by its servi-cers outside the scope of their authority as established in the Guide, and *Merrill* precludes liability against Freddie Mac for its servicers' unauthorized conduct. Although the Supreme Court recognized in *Merrill* the potentially harsh effects of this concept, that harshness is alleviated in this case by the fact that plaintiffs are not left without any recourse. Rather, recovery is sought, and may be had, against those who actually engaged in the conduct at issue— the servicers.

Thus, the court finds that the *Merrill* doctrine provides a complete defense to Freddie Mac from liability for any of the unauthorized acts of its servicers as alleged in plaintiffs' complaint. Accordingly, plaintiffs' amended complaint fails to state a claim against Freddie Mac, and Freddie Mac's motion to dismiss is granted.

An appropriate order will follow.