IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 93-3829

---

REW ENTERPRISES, INC. as RECEIVER
for FEDERAL LAND BANK OF JACKSON,

Plaintiff-Appellee/Cross-Appellant,

versus

PREMIER BANK, N.A.,

Defendant-Appellant/Cross-Appellee.

---

Appeal from the United States District Court
for the Middle District of Louisiana

---

(March 27, 1995)

Before POLITZ, Chief Judge, and HIGGINBOTHAM and DeMOSS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The Farm Credit Bank of Texas seeks to recover a payment made by the Federal Land Bank of Jackson to Premier Bank.[1] FCBT seeks to rescind the payment transaction as ultra vires or as payment of a thing not due under Louisiana law. Premier claims that FCBT is equitably estopped from relying on an ultra vires claim. Premier also counterclaims for recoupment.

---

[1] FLBJ and Premier were formerly Federal Land Bank of New Orleans and Ouachita National Bank, respectively. FCBT was substituted as plaintiff after it purchased this claim from REW Enterprises, Inc, which originally filed this suit in its capacity as receiver of FLBJ.

The district court granted summary judgment for FCBT on the ultra vires claim and against Premier on the recoupment claim. It also held that FCBT abandoned its alternative state law claims. Premier appeals the district court's grant of summary judgment, and FCBT cross-appeals the ruling that it abandoned its alternative state law claims. We affirm in part and reverse and remand in part.

I.

Thomas A. Grant, Suzanne Brunazzi Grant, and James C. Steele purchased timber land in northeast Louisiana with a $15 million loan from FLBJ. In 1983, the Grants and Steele submitted the loan application to Lawrence Bingham, President of the Federal Land Bank Association of Monroe. Federal land banks may generally lend only through federal land bank associations. 12 U.S.C. § 2020 (1982).[2] Bingham signed the loan on behalf of the Federal Land Bank of New Orleans, FLBJ's predecessor. The loan was secured by a mortgage on the purchased acreage, which then had an appraised value of $36 million.

A payment was to come due on January 1, 1985, and in the fall of 1984, the Grants and Steele approached A. J. Burns, Bingham's successor as President of the Monroe Association, about their expected inability to pay. The parties agreed that Burns would

_____

[2] The 1987 Agricultural Credit Act, effective January 6, 1988, significantly changed the organization of the Farm Credit System. The relevant events in this case occurred before January 6, 1988; accordingly, we apply the law in effect before the 1987 Act.

2

seek FLBJ's approval for a reamortization of the principal amount. Burns also agreed to provide a letter of credit to a commercial lender to secure a loan whose proceeds would be applied to the interest portion of the loan payment. The Ouachita National Bank agreed. ONB lent the Grants and Steele approximately $1.5 million upon receipt of a standby letter of credit and upon taking a mortgage on additional collateral, namely, 2,000 acres of the borrowers' unencumbered real property. Burns signed the letter of credit on behalf of FLBJ. The letter of credit required FLBJ to repay the loan in the event of default by the Grants and Steele. The proceeds from the ONB loan were used to pay the interest due on the FLBJ loan.

The Grants and Steele defaulted on the ONB loan, and ONB called the letter of credit. Only then did Burns tell FLBJ officers that there was a letter of credit. FLBJ officers decided to honor the letter, but asked Burns to negotiate a thirty-day extension. ONB agreed to the extension. FLBJ then honored the letter of credit, and ONB released its mortgage on the additional collateral. At FLBJ's request, the Grants and Steele executed a promissory note for the amount FLBJ paid to ONB, and FLBJ took a first lien on the additional collateral.

Burns was fired from the Monroe Association and later pleaded guilty to a violation of 18 U.S.C. § 1018 in connection with his issuance of the letter of credit. Ben Marshall, the loan officer at ONB, pleaded guilty to falsifying bank records.

Six months after FLBJ honored the letter of credit, the Grants and Steele defaulted on the promissory note. On May 20, 1988, the Farm Credit Administration closed FLBJ due to its insolvency, and REW was appointed as its receiver. REW transferred to FCBT the mortgagee rights in the additional collateral as well as in the collateral securing the original $15 million loan. On February 26, 1992, FCBT instituted foreclosure proceedings and at the sheriff's sale bought all of the property except approximately 1,000 acres of the additional collateral that it claims are contaminated with dioxins. FCBT then resold the property for approximately $22.5 million. The parties disagree on how much of that amount can be attributed to the additional collateral.

REW also sued to recover the payment made to ONB on the letter of credit. It then transferred its interest in the lawsuit to FCBT in consideration for FCBT's assumption of FLBJ's bond indebtedness.

II.

Before Congress enacted the 1987 Agricultural Credit Act, see supra note 2, the Farm Credit System was organized into twelve areas known as farm credit districts. In each district, three distinct Farm Credit System banks served the needs of farmers: (1) a federal land bank, which made long-term real estate mortgage loans through federal land bank associations; (2) a bank for cooperatives, which made loans to agricultural, aquatic, and rural utility cooperatives; and (3) a federal intermediate credit bank, which funded the short- and intermediate-term loans made by

4

production credit associations. Federal land banks were authorized to make loans only through federal land bank associations. 12 U.S.C. § 2020 (1982). Borrowers were required to apply for a loan at a land bank association and were also required to buy stock in the association. Id. §§ 2020, 2034(a). Section 2014 gave federal land banks the authority to "make or participate with other lenders in long-term real estate mortgage loans in rural areas . . . and make continuing commitments to make such loans under specified circumstances, or extend other financial assistance of a similar nature to eligible borrowers, for a term of not less than five nor more than forty years." Federal land banks were also authorized to "[e]xercise . . . all such incidental powers as may be necessary or expedient to carry on the business of the bank." Id. § 2012(21).

FCBT argues that issuance of a letter of credit was outside the statutory powers of a land bank. The district court agreed, holding that issuance of a standby letter of credit was not "necessary or expedient in the conduct of the business of the bank" because the business of the bank included only long-term lending against real estate security. We agree.

Congress created federal land banks for the sole purpose of providing long-term real estate mortgage loans. A rural borrower could seek short-term credit from banks for cooperatives or production credit associations. In fact, in 1971, Congress amended the Farm Credit Act to give banks for cooperatives and production credit associations the power to issue guaranties, instruments similar in function to letters of credit. Farm Credit Act of 1971,

5

Pub. L. No. 92-181, § 2.15, 1971 U.S.C.C.A.N. (85 Stat.) 655, 677. Farm Credit Administration regulations provided that banks for cooperatives could issue letters of credit. 12 C.F.R. § 614.4810. These powers, granted to institutions charged with providing short-term secured and unsecured credit, were never expressly conferred on land banks. The implication we draw from the structure of the Farm Credit System and from the language of the statute is that Congress could have authorized land banks to issue letters of credit, but chose not to. Because land banks were not authorized by statute to issue letters of credit, to do so was an ultra vires act.

When FLBJ decided to ask for an extension of time to pay the letter of credit, it was seeking to ratify an action it was not statutorily empowered to take. There is no evidence in the record that the board attempted to disavow the letter or that it paid the letter to settle what surely would have escalated to a significant controversy had it not paid. Rather, the extension stated that ONB was to consider it "as an amendment to our Irrevocable Letter of Credit No. 1, dated December 31, 1984. . . . All terms and conditions of the original Letter of Credit shall remain in force and will not be affected by this amendment except as referenced above in the expiration date." In short, we are not confronted with the authority of the board to settle a claim arising from an ultra vires act. We have before us only the unauthorized issuance and payment of a letter of credit. The act of FLBJ's board in honoring the letter of credit was an ultra vires act.

6

Premier argues that because national banks have the power to issue letters of credit, 12 C.F.R. § 7.7016, by analogy, so should land banks. Premier's argument is not persuasive. National banks are engaged in the general business of banking -- that is, they provide both long- and short-term credit. National banks are empowered "to carry on the business of banking." 12 U.S.C. § 24 (emphasis added). Banks in the Farm Credit System, by contrast, engaged in only those banking activities necessary to carry out their specific mission, which, in the case of land banks, was making long-term real estate mortgage loans. In other words, land banks exercised only those powers "necessary or expedient to carry on the business of the bank." 12 U.S.C. § 2012(21) (1982) (emphasis added). The distinction between "the business of banking" and "the business of the bank" illustrates the reason why national banks have the power to issue letters of credit while land banks do not. The difference in the language is not, as Premier suggests, insignificant.

Premier also asserts that the letter of credit falls within the bank's incidental powers because it benefited FLBJ by enabling it to keep "a major loan in the current and 'healthy' category on the bank's books." This argument is without merit. As a result of the letter of credit, all of the monies paid to FLBJ from the ONB loan were ultimately returned to ONB, with interest, such that FLBJ itself funded the Grants and Steele's installment.

7

III.

A.

By honoring the letter of credit, FLBJ committed an ultra vires act.  However, Premier claims FCBT is estopped from rescinding the transaction because, as a rule, an ultra vires claim cannot be pleaded by one who obtains benefits from the act and induces the adverse party to take measures detrimental to it.  See 7A William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations §§ 3407-3409 (perm. ed. rev. vol. 1989).  Premier's predecessor, ONB, detrimentally relied on the actions of FLBJ by releasing its mortgage on the additional collateral.  FLBJ benefitted by obtaining an interest in the additional collateral.

Though these benefits might otherwise support estoppel, estoppel is not permitted against the government.  See Office of Personnel Management v. Richmond, 496 U.S. 414, 419 (1990) (OPM); INS v. Hibi, 414 U.S. 5, 8 (1973) (per curiam); Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947); see also David K. Thompson, Note, Equitable Estoppel of the Government, 79 Colum. L. Rev. 551, 551 (1979) (Equitable Estoppel).  The Court in Merrill stated the rule as follows: "Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."  332 U.S. at 384.

The Merrill doctrine vindicates two central policies.  The first is protection of the public fisc.  To allow an assertion of

8

estoppel against the government would be to "invite endless litigation over both real and imagined claims of misinformation by disgruntled citizens, imposing an unpredictable drain on the public fisc." OPM, 496 U.S. at 433. There is no risk to the public fisc here because FLBJ was privately funded. The second "policy" is simply a sensitivity to separation of powers. We must give "respect for congressional intent within our constitutional system of allocated powers." McCauley v. Thygerson, 732 F.2d 978, 982 (D.C. Cir. 1984). Estopping an agency from disavowing an unauthorized act would validate the "agency's improper infringement of the authority of a coordinate branch." Equitable Estoppel, supra, at 565. It would permit "government employees to 'legislate' by misinterpreting or ignoring an applicable statute or regulation." Portmann v. United States, 674 F.2d 1155, 1159 (7th Cir. 1982).

B.

While the Merrill doctrine erects a high wall against the assertion of estoppel, it does so only to protect government entities. Whether an entity is governmental for purposes of estoppel does not turn on its label, such as agency, instrumentality, or private corporation, but rather on congressional intent. See McCauley, 732 F.2d at 982; Equitable Estoppel, supra, at 565-67.

In Federal Land Bank v. Bismarck Lumber Co., 314 U.S. 95 (1941), the Court had to determine whether the land bank was required to pay a sales tax imposed by the North Dakota

9

legislature. The Court concluded that Congress could "constitutionally immunize from state taxation activities in furtherance of the lending functions of federal land banks." <u>Id.</u> at 99. The state had argued that the bank's business of lending money was essentially a private function. The Court rejected this argument: "Through the land banks the federal government makes possible the extension of credit on liberal terms to farm borrowers. . . . They are `instrumentalities of the federal government, engaged in the performance of an important governmental function.'" <u>Id.</u> at 102 (quoting <u>Federal Land Bank v. Priddy</u>, 295 U.S. 229, 231 (1935)); <u>see also</u> 12 U.S.C. § 2011 (1982) (federal land banks are "federally chartered instrumentalities of the United States").

Premier argues that while a land bank may be immune from taxation based on its status as a federal instrumentality, that immunity does not insulate it from principles of equitable estoppel. It is true that national banks, as federal instrumentalities, are not subject to state taxes but are subject to estoppel defenses. <u>See</u> <u>First Agric. Nat'l Bank v. State Tax Comm'n</u>, 392 U.S. 339, 340-43 (1968); <u>Department of Employment v. United States</u>, 385 U.S. 355, 360 (1966). We also recognize that the rule that federal instrumentalities are immune from state taxation is a unique rule, clothed in pedigree. <u>See</u> <u>McCulloch v. Maryland</u>, 17 U.S. (4 Wheat.) 316 (1819). However, the language of <u>Bismarck</u> is broad, stretching beyond the limits of immunity from taxation to the broader governmental function of land banks and the

10

federal agricultural banking system in general: "Through the land banks the federal government makes possible the extension of credit on liberal terms to farm borrowers." 314 U.S. at 102. The Farm Credit Act limits the functions of land banks to long-term lending. To permit lending outside that function would thwart that statutory purpose. Because the relevant inquiry is not what label can be attached to land banks but rather what Congress intended, we hold that Premier may not assert an estoppel defense against FCBT.[3]

This conclusion fits with the limited number of decisions that have considered the issue. In Williams v. FLBJ, 954 F.2d 774 (D.C. Cir.), cert. denied, 113 S. Ct. 299 (1992), Katherine Williams and her mother, Elizabeth Saunders, used their plantation as security for a loan of $1.3 million. Some six years after obtaining the loan, Williams and Saunders wanted to sell the plantation to Duncan Williams for $1.45 million or about $999 per acre and reduce their debt to approximately $400,000. The land bank association, on behalf of the land bank and at the direction of the Farm Credit System Capital Corporation, rejected the proposal. After the death of her mother and less than one month after their first proposal,

---

[3] We decide today only that a pre-1987 Act land bank is not subject to an equitable estoppel defense. Whether or not a land bank could be considered a government actor for due process purposes, Federal Tort Claims Act purposes, or any other purpose is an issue we leave for another day. Cf. Mendrala v. Crown Mortgage Co., 955 F.2d 1132, 1138-39 (7th Cir. 1992) (holding that Federal Home Loan Mortgage Corporation was not an agency for purposes of Federal Tort Claims Act but was sufficiently governmental to be immune from an estoppel defense); LPR Land Holdings v. Federal Land Bank, 651 F. Supp. 287, 292 (E.D. Mich. 1987) (holding that land banks are not government actors for purpose of due process challenge).

Williams submitted another proposal to sell the plantation and an adjoining tract for $1.6 million or $903 per acre and extinguish her debt. This time, the land bank association approved the offer on behalf of the land bank. The sale closed, and Williams paid off the loan.

Williams filed suit against the land bank association, the land bank, and the Capital Corporation, alleging various torts and breaches of contract related to the two proposals. In defense, the banks alleged they were required by regulation to reject Williams and Saunders' first proposed borrowing because it would exceed eighty-five percent of the appraised value of the real estate security.

Williams responded that the banks could not invoke the eighty-five percent rule because they had ignored it in the past. The court rejected this argument, finding that estoppel would allow continued violations. <u>Id.</u> at 778.[4] "The extreme judicial reluctance to apply estoppel against the government arises out of a concern that otherwise negligent or dishonest officials could bring about violations of law by making misrepresentations. [Williams'] proposed rule would engender illegality on a far greater scale, and for far less equitable justification." <u>Id.</u> (citation omitted).

---

[4] The <u>Williams</u> court used the term "federal agency" in describing the land bank. <u>See</u> 954 F.2d at 778. Since application of the <u>Merrill</u> doctrine turns on congressional intent rather than whether an institution can be considered a federal agency, we decline to decide whether a land bank is a federal agency.

12

In <u>Mendrala v. Crown Mortgage Co.</u>, 955 F.2d 1132 (7th Cir. 1992), the Mendralas borrowed $110,000 from Crown Mortgage Company to finance the purchase of an apartment building. The loan application form disclosed that the Federal Home Loan Mortgage Corporation would be involved and had to approve the loan. At closing, the Mendralas "executed an Estoppel Certificate which certified the validity and enforceability of the loan documents in order 'to induce [FHLMC] . . . to accept an assignment of [the] Note and Mortgage.'" <u>Id.</u> at 1133. Without the Mendralas' permission, Crown added a "lockout" provision to the loan documents. Under this provision, the Mendralas could not prepay the loan for five years. Four years after obtaining the loan, the Mendralas requested and received a pay-off statement from Crown. The Mendralas then paid the balance of the loan. When FHLMC learned of the attempted prepayment, it advised Crown to return the Mendralas' check. The check was returned, but the Mendralas stopped paying monthly installments on the loan. The Mendralas filed suit against Crown and the FHLMC alleging breach of contract, slander of title, and fraudulent alteration of the note. The Mendralas also sought to quiet title, cancel the note, and release the mortgage of record. The FHLMC filed a counterclaim for foreclosure.

The district court dismissed the Mendralas' tort claims on the grounds that it lacked subject matter jurisdiction. The court reasoned that FHLMC's activity fell within the intentional tort exception to the waiver of sovereign immunity contained in the

13

Federal Tort Claims Act. The court of appeals reversed, holding that the FHLMC was not an agency under the FTCA and, therefore, was "prima facie suable under its enabling statute." Id. at 1134.

Despite its holding that the FHLMC was not an agency for FTCA purposes, the court invoked the Merrill doctrine and held that FHLMC could not be bound by Crown's unauthorized conduct. The court concluded that the FHLMC had "a public statutory mission: to maintain the secondary mortgage market and assist in meeting low- and moderate-income housing goals. Holding the FHLMC responsible for the unauthorized actions of an entity such as Crown would thwart its congressional purpose." Id. at 1140-41 (footnote omitted). This conclusion, the Mendrala court held, was strengthened by the fact that the unauthorized act was committed by a separate entity and not by an employee of the FHLMC. Id. at 1141.

This case is similar to both Williams and Mendrala. As in Williams, upholding the letter of credit transaction would permit a land bank to continue to violate its enabling statute. As in Mendrala, to bind FLBJ to Burns's unauthorized issuance of the letter of credit would impede the bank's statutory mission to provide farmers with long-term real estate credit on favorable terms. See also Greene County Nat'l Farm Loan Ass'n v. Federal Land Bank, 152 F.2d 215, 220 (6th Cir. 1945), cert. denied, 328 U.S. 834 (1946).

14

IV.

Premier claims that even if the Merrill doctrine applies in this case, FCBT should still be estopped from asserting ultra vires because FLBJ's actions fall into an affirmative misconduct exception.[5] Under this exception, a party may be entitled to equitable relief against the government if it establishes that the government engaged in affirmative misconduct. See United States v. Lair, 854 F.2d 233, 237-38 (7th Cir. 1988). To qualify as affirmative misconduct, a "party must allege more than mere negligence, delay, inaction, or failure to follow an internal agency guideline." Fano v. O'Neill, 806 F.2d 1262, 1265 (5th Cir. 1987). In Fano, an alien claimed that he lost an opportunity to obtain permanent residence in the United States because the Immigration and Naturalization Service failed to act quickly enough on his application for permanent resident status. Fano claimed that the INS failed to follow its own internal directive and, therefore, was estopped from denying him permanent resident status. The court, recognizing that agencies are normally immune from such estoppel arguments, nevertheless reversed the lower court's grant of summary judgment on the grounds that Fano's allegation that the INS acted "willfully, wantonly, recklessly, and negligently" was

_____

[5]     The Supreme Court has never squarely decided whether affirmative misconduct can serve as a basis for avoiding the Merrill doctrine. This court expressed similar uncertainty in Premier Bank v. Mosbacher, 959 F.2d 562, 569 n.3 (5th Cir. 1992). However, since at least one panel in this circuit has recognized this exception, we too will assume that affirmative misconduct is an exception to the Merrill doctrine.

15

sufficient to fall within the affirmative misconduct exception. Id. at 1265-66.

For Premier to prevail under this theory, we would have to impute Burns's act of issuing the letter of credit to FLBJ. However, in FDIC v. Langley, 792 F.2d 547, 549 (5th Cir. 1986), we held that land bank association officers are not agents of land banks in disbursing the proceeds of a loan. When Burns issued the letter of credit to the Grants and Steele, he was not acting as the agent of FLBJ.

Premier argues that Burns is an employee of the land bank because FLBJ claimed that Burns was an employee in separate litigation. In this separate suit, FLBJ sought to recover under a fidelity bond for losses resulting from Burns's unauthorized conduct. Because the fidelity bond covers the entire Farm Credit System, specific institutional employee designations lacked consequence. As such, the designation has little significance here.

Next, Premier argues that by asking for a thirty-day extension and then honoring the letter of credit, FLBJ itself committed affirmative misconduct. However, Premier argues in its brief nothing more than that FLBJ's acts "definitely went beyond mere negligence." This type of conclusory allegation will not suffice to overcome the Merrill rule. The Supreme Court has counseled that courts should be cautious in recognizing exceptions to the Merrill doctrine. OPM, 496 U.S. at 422. There is no suggestion that FLBJ officers deliberately induced ONB to release its mortgage on the

16

additional collateral by honoring a letter of credit it thought unenforceable.

Finally, Premier argues that the Merrill doctrine does not apply to preclude its assertion of estoppel because FLBJ was acting in its proprietary capacity.  Under this purported exception, government activities that are undertaken primarily for the commercial benefit of the government are subject to estoppel.  See FDIC v. Harrison, 735 F.2d 408, 411 (11th Cir. 1984); United States v. Florida, 482 F.2d 205, 209 (5th Cir. 1973).  This argument is sunk by Bismarck:

> The argument that the lending functions of the federal land banks are proprietary rather than governmental misconceives the nature of the federal government with respect to every function which it performs.  The federal government is one of delegated powers, and from that it necessarily follows that any constitutional exercise of its delegated powers is governmental.  It also follows that, when Congress constitutionally creates a corporation through which the federal government lawfully acts, the activities of such corporation are governmental.

314 U.S. at 102 (citations omitted).  While the force of this language undoubtedly is limited to the case's land bank facts, see supra note 3, its continued applicability has yet to be questioned.

V.

Because the letter of credit transaction was ultra vires and FCBT is not estopped from so claiming, we must next decide to what extent FCBT should recover.  Premier counterclaimed for recoupment. "Recoupment is the act of rebating or recouping a part of a claim upon which one is sued by means of a legal or equitable right resulting from a counterclaim arising out of the same transaction."

17

Howard Johnson, Inc. v. Tucker, 157 F.2d 959, 961 (5th Cir. 1946) (citation and internal quotation marks omitted); see also University Medical Ctr. v. Sullivan (In re University Medical Ctr.), 973 F.2d 1065, 1079-80 (3d Cir. 1992). Recoupment differs from setoff in that "setoff is a counter demand which a defendant holds against a plaintiff arising out of a transaction extrinsic of plaintiff's cause of action." Howard Johnson, 157 F.2d at 961. Premier claims a right to recoup the money that FCBT recovered when it sold the additional collateral and the money that FLBJ received when ONB loan proceeds were used to pay interest on the FLBJ loan.

FCBT argues that Premier is not entitled to recoupment because FCBT purchased only the claim from REW and not any liabilities. "The purchaser of an asset from a failed institution is not liable for the conduct of the receiver or [failed] institution unless the liability is transferred and assumed." Kennedy v. Mainland Sav. Ass'n, 41 F.3d 986, 990 (5th Cir. 1994) (citation and internal quotation marks omitted); see also First Indiana Fed. Sav. Bank v. FDIC, 964 F.2d 503, 506-07 (5th Cir. 1992); Trigo v. FDIC, 847 F.2d 1499, 1503 (11th Cir. 1988). Premier's claim for the money paid to FLBJ is a general claim properly asserted against FLBJ's receiver, REW. See Kennedy, 41 F.3d at 990-91. However, Premier may maintain its claim to recoup the amount FCBT recovered when it sold the additional collateral.

Although FCBT did not assume the general liabilities of FLBJ, it did purchase the mortgagee rights to the additional collateral. FCBT's argument that when it purchased this ultra vires claim, it

18

only assumed FLBJ's bond indebtedness and not liability for recoupment misconceives the remedy. In determining the availability of recoupment, we do not look to the liabilities FCBT assumed when it purchased this ultra vires claim but to the original letter of credit transaction. Premier's claim of recoupment for the amount that FCBT recovered in its sale of the additional collateral arises out of the same transaction as the ultra vires claim. But for FLBJ's payment of the letter of credit, Premier would not have released its interest in the additional collateral.

Because an ultra vires contract is null and void, the remedy for rescission of that contract is to put the parties in the position they would have occupied had the unlawful agreement not been made. See Fletcher, supra, § 3571. Accordingly, Premier may recoup the amount FCBT recovered on the sale of the additional collateral. This adjustment ensures that FCBT does not receive a windfall as a result of its rescission of the ultra vires contract.

The record indicates that the parties disagree as to the amount that should be apportioned to the additional collateral; therefore, we must remand to give the district court the opportunity to make findings on this issue.

VI.

In its cross-appeal, FCBT claims that the district court erred in dismissing its state law claims as abandoned. FCBT had planned to pursue these claims if its ultra vires claim did not succeed.

19

Because we have affirmed the district court's determination that the transaction was ultra vires and FCBT will recover the letter of credit payment less any recoupment, we find resolution of this issue to be unnecessary.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.