TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos Federal Home Loan Mortgage Corp., en adelante, la peticionaria, solicitando la revisión de una Resolución emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón. Mediante dicho dictamen, el tribunal a quo denegó una “Solicitud de Sentencia Sumaria Parcial para Desestimar Reconvención contra Federal Home Loan Mortgage Corp. y se Continúe con Ejecución de Hipoteca” presentada por la peticionaria.
Por las razones que se esbozan a continuación, se expide el auto solicitado y se revoca la Resolución recurrida.
I
Conforme surge del recurso ante nuestra consideración, el 21 de agosto de 1995, la peticionaria, por conducto de su apoderada, R&G Mortgage, instó demanda sobre ejecución de hipoteca en contra de Hiram Neftalí Ortiz Robles, Guillermina Vicente y la Sociedad de Bienes Gananciales compuesta por ambos, en adelante, Ortiz Robles y Vicente. Se alegó que, en o alrededor de 25 de agosto de 1977, Ortiz Robles y Vicente por valor recibido suscribieron un pagaré por la suma principal de $42,400, más intereses al 9% anual y demás créditos accesorios. En aseguramiento del pagaré, antes mencionado, Ortiz Robles y Vicente otorgaron hipoteca voluntaria. Por su parte, la peticionaria es la tenedora por endoso y buena fe del pagaré.
Se alegó que Ortiz Robles y Vicente incurrieron en incumplimiento del contrato de préstamo hipotecario habiendo dejado de pagar las mensualidades vencidas de los meses de junio, julio y agosto de 1995. Se planteó que los requerimientos de pago habían sido infructuosos por lo que la peticionaria había declarado vencida la totalidad de la deuda. En consecuencia, solicitó se declarara Con Lugar la demanda instada y se dictaran aquellas providencias típicas de una ejecución de hipoteca.
El 24 de octubre de 1995, la peticionaria presentó demanda enmendada, en contra de la Sucesión de Sofía Rivera Serrano, compuesta por Carmen I. Alvarez, XYZ y el Estado Libre Asociado. Alegó que la obligación objeto de la ejecución de autos había sido originalmente suscrita por Ortiz Robles y Vicente y éstos posteriormente vendieron dicha propiedad a la finada Sofía Rivera Serrano. 
Trabada la controversia entre las partes, el 15 de febrero de 1996, la Sucesión de Sofía Rivera Serrano, en adelante, la recurrida, emitió alegación responsiva, compareciendo pro se.
Posteriormente, y en lo que en este recurso respecta, la recurrida instó, entre otros extremos, una reconvención. En la primera causa de acción alegó:

*516
“1. La demandante (peticionaria) ha incumplido con el contrato primario de préstamo al negarse a aceptar los pagos para plazos posteriores al plazo de junio de 1995, el cual fue cobrado por la demandante (peticionaria) o su presunto agente R&G Mortgage.

2. La demandante (peticionaria) ha incumplido con el contrato secundario de garantía de préstamo, o sea el contrato de hipoteca, radicando demanda sin que se cumpliera con el requisito de tres plazos vencidos e impagados.

3. La demandada (recurrida) se ha visto acosada ante la actitud contumaz de la demandante (peticionaria) al negarse al diálogo y al negarse a aceptar los pagos. La demandada (recurrida) ha tenido que instar procedimiento de consignación para cumplir con su obligación de mitigar daños y para protegerse contra las imputaciones de deficiencias de pago.

Véase, Anejo 16 del Apéndice.
Alegó que los actos de la peticionaria le habían causado daños morales, económicos y angustias mentales que estimó en $30,000.
En su segunda causa de acción alegó:

5. Se alega, además, que bajo esta misma sección los actos de la demandante (peticionaria) constituyen la persecución maliciosa reconocida por nuestra jurisprudencia, a saber:

a. La demandante (peticionaria) acosa a la demandada (recurrida) constantemente obligándola a producir evidencia de pago.

b. Según el mejor saber de la demandada (recurrida), la demandante (peticionaria) ha radicado ejecución de hipoteca en dos o tres ocasiones adicionales, indebidamente, por no existir la deficiencia alegada.

c. La demandada (recurrida) una y otra vez ha provisto a la demandante (peticionaria) la evidencia y ha tenido que consignar en el en el tribunal en dos ocasiones anteriores.

d. La demandante (peticionaria) recibe los pagos, los detiene y luego los cobra tardíamente. ”

Id.

Así las cosas, y luego de numerosos trámites, las partes presentaron el Informe Sobre Conferencia Preliminar entre Abogados. En el mismo, la recurrida enmendó su reclamación, solicitando daños ascendentes a $11,500,000. Asimismo, adujo hechos adicionales que incluyeron que las acciones de la peticionaria habían ocasionado que su madre sufriera un problema cardíaco en 1986. Asimismo, argüyó que durante 20 años la peticionaria la había hostigado “devolviendo los pagos, alegando deficiencias inexistentes, amenazando continuamente con ejecutar la hipoteca y reteniendo los cheques enviados y alegando no haberlos recibido.’” Véase, Anejo 129 del Apéndice.
Surge de autos que la reclamación instada por la recurrida le fue notificada por R&G Mortgage a la peticionaria en o alrededor de febrero de 2004. El 2 de abril de 2004, la peticionaria compareció, por primera *517 vez, sin la intervención de R&G Mortgage, al Tribunal de Primera Instancia.
Luego de varios trámites procesales, la peticionaria presentó escrito intitulado “Solicitud de Sentencia Sumaria Parcial para Desestimar Reconvención contra Federal Home Loan Mortgage Corp. y se Continúe con Ejecución de HipotecaDescansó la solicitud en la doctrina Merrill. Adujo, en esencia, que la peticionaria, al ser considerada para ciertos propósitos una instrumentalidad federal, estaba inmune a lo reclamado en la reconvención. Su planteamiento fue a los efectos que si no cometió ningún acto torticero alguno en contra del deudor hipotecario, la peticionaria no respondía por los actos no autorizados de sus agentes, en este caso R&G Mortgage. A tales efectos, alegó que como cuestión de derecho se debía desestimar la reconvención instada por la recurrida. Presentó como hechos que no estaban en controversia los siguientes, los cuales transcribimos in extenso:

“1. Freddie Mac (peticionaria) actualmente es una corporación de los Estados Unidos conforme a cédula conferida bajo la Federal Home Loan Mortgage Corporation Act (12 U.S.C.8 1451 et seq.). Esta fue creada por el Congreso de los Estados Unidos con el propósito de proveer estabilidad en el mercado secundario de hipotecas residenciales, y para otros propósitos según establece su ley orgánica. Freddie Mac (peticionaria) ayuda a aumentar la disponibilidad de hipotecas para familias de recursos medianos y bajos a través de todos los Estados Unidos y sus territorios. Conforme a su ley orgánica, una de las actividades principales de Freddie Mac (peticionaria) es el adquirir préstamos hipotecarios residenciales originados por bancos aprobados y casas hipotecarias. Freddie Mac (peticionaria) no provee servicio a los préstamos que adquiere; ésta contrata con bancos y casas hipotecarias aprobadas para que éstas le presten servicios a los préstamos. Las instituciones que prestan el servicio a estos préstamos de Freddie Mac (peticionaria) les requiere que cumplan con su guía llamada “Single-Family-Seller/Service Guide” (de aquí en adelante la “Guía”).

2. R&G Mortgage es una entidad que se dedica a la originación de préstamos hipotecarios, que en ocasiones vende éstos en los mercados secundarios. Esta también se dedica a proveer servicio a hipotecas residenciales de otros acreedores como Freddie Mac (peticionaria). Entiéndase que el “servicio” que se provee a Freddie Mac (peticionaria) como: realizar gestiones de cobro de las hipotecas, mantener todas las cuentas necesarias -incluyendo aquellas cuentas de plica para contribuciones y seguros-, realizar los pagos necesarios -incluyendo el pago de principal e intereses a Freddie Mac (peticionaria) y pagos por seguros y contribuciones- al igual que a conducir y manejar las ejecuciones de hipotecas que aseguran los préstamos hipotecarios.

3. Entre Freddie Mac (peticionaria) y R&G Mortgage existe un contrato a través del cual R&G Mortgage se convertiría en vendedor de préstamos y proveería servicio a los préstamos para Freddie Mac (peticionaria). A esos efectos, Freddie Mac (peticionaria) le concedió a R&G Mortgage un poder con fecha de mayo 21 de 1982. Este provee para que R&G Mortgage dé servicio a las hipotecas de Freddie Mac (peticionaria) y sirva como apoderado de ésta, incluyendo la radicación de procedimientos de ejecución de hipoteca a nombre de Freddie Mac (peticionaria). La Guía establece específicamente que R&G Mortgage no actúa como agente de Freddie Mac (peticionaria) en capacidad alguna, sino que es un contratista independiente.

4. El Sr. Hiram Neftalí Ortiz Robles y su esposa constituyeron una hipoteca el 25 de agosto de 1979. Posteriormente dicho préstamo fue asumido por la Sra. Rivera Serrano, q.e.p.d. el 23 de diciembre de 1980. Freddie Mac (peticionaria) conoció por primera vez de esta asunción a principios del año 2004.

5. Desde por lo menos el 21 de mayo de 1982, R&G Mortgage es la entidad que provee el servicio al préstamo en controversia. Freddie Mac (peticionaria) no ha tenido contacto o relación alguna con su señora madre q.e.p.d.- o con Doña Carmen (recurrida)- y de la cual se queja ésta en la demanda hasta que compareció por primera vez en este caso el 2 de abril de 2004.

*518
6. La Sra. Rivera Serrano, q.e.p.d., falleció el 31 de marzo de 1995 en California. Doña Carmen Alvarez (recurrida) es aparentemente su única heredera. ”

Véase, Anejo 182 del Apéndice.
La recurrida interpuso oposición. Alegó que la defensa invocada no aplicaba y que había sido presentada tardíamente. En particular, argüyó que la peticionaria le era responsable al palio de las disposiciones del Código Civil.
Luego de varios trámites, el 18 de mayo de 2005, notificada el 15 de junio de 2005, el Tribunal de Primera Instancia emitió la Resolución recurrida. Mediante dicho dictamen, denegó la petición de la peticionaria.
Inconforme ante tal dictamen, la peticionaria acude ante nos. Junto con su escrito presentó una “Moción en Auxilio de Jurisdicción y Solicitud de Paralización de los Procedimientos de Conformidad con la Regla 35 y 79 del Reglamento del Tribunal de Apelaciones”. El 14 de julio de 2005, emitimos Resolución ordenando a la parte recurrida mostrara causa por la cual no debíamos expedir el auto solicitado. Habiendo cumplido dicha parte, procedemos a resolver conforme intimado.
II
En su escrito, la peticionaria plantea que incidió el Tribunal de Primera Instancia al entender que no procede dictar sentencia sumaria por existir controversias de hechos.
III
Es norma reiterada que mediante la moción de sentencia sumaria, regulada por la Regla 36 de las de Procedimiento Civil, 32 L.P.R.A. Ap. Ill, R. 36 et. seq., un tribunal puede disponer de un caso sin celebrar vista en su fondo en aquellas situaciones en que la parte que la solicita demuestra que no existe controversia en cuanto a los hechos esenciales alegados en la demanda y que tan sólo resta disponer de las controversias de derecho existentes. PFZ Properties, Inc. v. Gen. Acc. Ins. Co., 136 D.P.R. 881, 911 (1994); Medina v. M. S. & D. Química, P.R., Inc., 135 D.P.R. 716, 726-727 (1994); Caquías v. Asoc. Res. Mansiones Río Piedras, 134 D.P.R. 181, 216 (1993).
El propósito de la sentencia sumaria es aligerar la tramitación de los casos en forma justa, rápida y económica, permitiendo que se dicte sentencia cuando de los documentos surge que no existe disputa sobre un hecho esencial y sólo resta aplicar el derecho, por lo que resulta innecesario celebrar un juicio en su fondo. Rosario Ortiz v. Nationwide Insurance Co., res. el 4 de marzo de 2003,2003 J.T.S. 34; González v. Alicea, Dir. Soc. Asit. Legal, 132 D.P.R. 638, 646-647 (1993); Mercado Vega v. U.P.R., 128 D.P.R. 273, 281 (1991); Camaleglo v. Dorado Wings, Inc., 118 D.P.R. 20, 25-26 (1986); Padín v. Rossi, 100 D.P.R. 259, 263 (1971).
En este contexto, el tribunal debe analizar si existen o no controversias en cuanto a los hechos y que en derecho procede emitir sentencia a favor de la parte que la solicita. No cabe duda que un tribunal debe dictar sentencia sumaria a favor de la parte promovente si de los autos y de los documentos presentados en apoyo y oposición de dicha moción surge que no existe controversia alguna en cuanto a los hechos esenciales y que, como cuestión de derecho, procede que se dicte la misma a favor de la aludida parte.
Sin embargo, como dicha determinación requiere la adjudicación de un litigio sin que las partes tengan la oportunidad de presentar su caso ante el tribunal, la jurisprudencia ha concebido la sentencia sumaria como un remedio extraordinario que sólo debe concederse cuando el promovente ha establecido su derecho con claridad. Benítez Esquilín v. Johnson & Johnson, res. el 30 de septiembre de 2002, 2002 J.T.S. 137; García Díaz v. Darex P.R., 148 D.P.R. 364, 382 (1999). Además, se puede conceder cuando el promovente ha tenido una oportunidad adecuada de demostrar que el oponente no tiene derecho a que se dicte sentencia en su favor como *519 cuestión de derecho. menor v. J.L.E.M., menor, 124 D.P.R. 910, 930 (1989); Flores v. Municipio de Caguas, 114 D.P.R. 521, 525 (1983); Sucn. Meléndez v. DACO, 112 D.P.R. 86, 89 (1982).
De otro lado, le corresponde a la parte promovida rebatir dicha moción por vía de declaraciones juradas u otra documentación que apoye su posición, pues si bien el no hacerlo necesariamente no significa que ha de emitirse el dictamen sumario automáticamente en su contra, tal omisión lo pone en riesgo de que ello ocurra. Corp. Presiding Bishop CJC of LDS v. Purcell, 117 DPR 714, 720-721 (1987); Flores v. Municipio de Caguas, supra, a la pág. 525. Esto significa que toda duda sobre si un hecho fue controvertido, debe resolverse a favor de la parte que se opone a la moción porque en esta etapa del procedimiento el juez no debe considerar la credibilidad de los documentos.
La Regla 36.3 de las de Procedimiento Civil, supra, impone al juez que atiende una solicitud de sentencia sumaria la obligación de considerar no sólo las declaraciones juradas sometidas para sustentarlas o las contra declaraciones juradas de la parte contraria, sino también “las alegaciones, [deposiciones], contestaciones a interrogatorios y admisiones ofrecidas” amén de “todo documento admisible en evidencia” que obre en autos. Mgnt. Adm. Servs. Corp. v. E.L.A., 152 D.P.R. 599, 610-611 (2000); Flores v. Municipio de Caguas, supra, a la pág. 525; Padín v. Rossi, supra, a la pág. 263.
A tenor con esta obligación, el juzgador deberá analizar concienzudamente la moción de sentencia sumaria y su oposición, con sus respectivos anejos y el expediente en su totalidad, con el propósito de determinar si queda algún hecho material en controversia o si existen alegaciones afirmativas en la demanda radicada que no han sido refutadas. En cualquiera de dichos casos, de ello ser así, el tribunal deberá denegar la solicitud de sentencia sumaria. Corp. of Presiding Bishop CJC of FDS v. Purcell, supra, a las págs. 720-721. Una vez el tribunal tiene ante sí iodos los documentos, debe analizar los hechos en la forma más favorable a la parte que se opone a que se dicte sentencia sumaria. Méndez Arocho v. El Vocero de P.R., 130 D.P.R. 867, 873-874 (1992). La existencia de duda por parte del tribunal sobre la existencia o no de una controversia de hechos en el caso bajo su consideración, derrota la moción de sentencia sumaria. Corp. Presiding Bishop CJC of LDS v. Purcell, supra, a la págs. 720-721.
Así, “sólo procede dictar sentencia sumaria cuando surge claramente que el promovido por la moción no puede prevalecer bajo ningún supuesto de hechos y que el tribunal cuent[a] con la verdad de todos los hechos necesarios para poder resolver la controversia. (Cita de caso omitida). Cuando no existe una clara certeza sobre todos los hechos de la controversia, no procede una sentencia sumaria”. Mgnt. Adm. Servs. Corp. v. E.L. A., supra, a la pág. 610.
En relación a la Doctrina Merrill, la jurisprudencia federal, que por su valor persuasivo citamos, ha apuntado:

“Plaintiffs base their claim under this statute on the acts of the loan servicers rather than on acts committed by the FHLMC itself. The question, therefore, is whether or not the FHLMC is bound by acts of its loan servicers. Neither the Supreme Court nor the Eleventh Circuit has spoken on the issue of whether or not the loan servicers are agents of the FHLMC. The FHLMC contends that the servicers are not agents but, rather, independent contractors. Plaintiffs contend that the loan servicers are agents of the FHLMC. The courts that have considered this question are divided on the issue. The court, however, does not need to decide the agency issue because, regardless of whether or not the seller/servicers are agents, the FHLMC is protected... by the Merrill doctrine.

The Merrill doctrine is based on the Supreme Court's decision in Fed. Crop Ins. Com, v. Merrill, 332 U. S. 380. 92 L. Ed. 10. 68 S. Ct. L (1947). Ln that case, the Supreme Court held that where a federal regulation prohibited the corporation from insuring a certain crop (reseeded spring wheat), an agent for the corporation 
*520
could not bind the corporation to so insure that crop even though neither the agent nor the farmer was aware of the regulation. Id., at 384-85. The Court thus held, despite acknowledging that “we assume that recovery could be had against a private insurance company. ” Id., at 383. In fact, the Court noted: “The rules of law whereby private insurance companies are rendered liable for the acts of their agents are not bodily applicable to a Government agency like the Corporation, unless Congress has so provided. ” Id., at 384 n.l.

The FHLMC is protected by the Merrill doctrine. The FHLMC is a federal instrumentality that relies on these seller/servicers to service the mortgages that the FHLMC owns. As a federal instrumentality, it is not bound by the unauthorized acts of its seller/servicers. Servicers are expressly required by the Guide to comply with all applicable law. See Guide § 53.8. Furthermore, the servicers are required to give all disclosures required by law relating to the terms under which mortgage insurance may be canceled. See Guide § 61.1. Therefore, to the extent that New York law, including the New York UDAP, would require disclosure of the cancellation provisions, the servicers are required to follow that law. Their unauthorized failure to do so is not a valid basis for recovery against the FHLMC. As far as the court is aware, all courts that have considered the applicability of Merrill to the FHLMC or similar entities have reached a similar conclusion.

In Mendrala v. Crown Mortsase Co., 955 F. 2d 1132 (7th Cir. 1992), the court held that the FHLMC was protected by the Merrill doctrine and was not bound by the unauthorized actions of its seller/servicer. Id., at 1140-41. The court stated: “Holding the FHLMC responsible for the unauthorized actions of an entity such as [its seller/servicer] would thwart its congressional purpose." Id., at 1141. In that case, the mortgagors attempted to refinance their note by taking out a different loan with another bank and paying off the note held by the FHLMC as serviced by Crown. The note held by the FHLMC contained a lock-out provision, however, that precluded pre-payment of the note. Nonetheless, Crown accepted the prepayment and sent a pay-off statement to the Mendralas. The FHLMC informed Crown of the lock-out provision and refused to accept the prepayment. The Mendralas asserted that the FHLMC was estopped from reversing the actions of Crown, but the court held that the FHLMC was not bound by Crown's acceptance of the pre-payment because Crown was not authorized to accept pre-payment due to the lock-out provision. Id., at 1141-42.

Other courts that have considered this issue have also reached a similar conclusion. In Dupuis v. Federal Home Loan Mortsase Corp., 879 F. Supp. 139 (D. Me. 1995), the court held that despite the fact that the seller/ servicer was the FHLMC's agent and despite the fact that the FHLMC would be liable at common law, the Merrill doctrine provided a complete defense for the FHLMC on all of the plaintiffs contract claims. Id. at 144. Furthermore, the court held that the Merrill doctrine provided a defense to any claim for breach of the duty of good faith and fair dealing. Id. at 145. In Hinton, a case similar to the one at bar, the court held that the FNMA (an entity analogous to the FHLMC), “cannot be held liable for the acts of servicers that it has not expressly authorized. ’’ Hinton, 945 F. Supp. At 1060 (citingMerrill. 332 U.S. at 384 n.1.).

Deerman v. Federal Home Loan Mortgage Corporation, 955 F. Supp. 1393. Plaintiffs' amended complaint also asserts liability against Freddie Mac for conduct occurring after its acquisition of Community's mortgages in 1987. Although plaintiff asserts direct liability against Freddie Mac, the complaint fails to make a single allegation of any affirmative act committed by Freddie Mac itself. Freddie Mac operates solely in the secondary market and is not involved in any way in the servicing of the mortgage loans which it purchases from originating lenders. Hashop v. FHLMC, 171 F.R.D. 208. 210-11 (N.D.Ill. 1997). Rather, Freddie Mac contracts with either the loan originator or another party to service the loans that they purchase, and Freddie Mac exclusively relies on the loan servicers to control all aspects of the mortgage servicing operations. Id. Thus, the only means by which Freddie Mac could be held liable for post-1987 breaches or other wrongful conduct relating to the loans would be through vicarious liability for the actions of its servicers: first Community, then Standard. However, the court finds that Freddie Mac is protected from liability for its servicers’ breaches or other wrongful conduct under the Merrill doctrine.

*521 [HN5]Since Merrill, the doctrine that the government cannot be estopped or bound by the unauthorized acts or conduct of its agents or its employees has been widely applied in a variety of contexts. For example, it is well-settled that “only those with specific authority can bind the government contractually; even those persons may do so only to the extent that their authority permits. Gardiner v. Virgin Islands Water & Power Authority, 39 V.I. 519, 145 F.3d 635, 644 (3d Cir. 1998). This judicial reluctance to bind the government by its agent’s unauthorized conduct is based upon numerous considerations including sovereign immunity, separation of powers and public policy. Lovell Manufacturins v. Expert-Import Bank of the United States. 777 F.2d 894, 898 (3d Cir.1985). As recently as 1990, the Supreme Court reiterated its continuing reluctance to stop or to bind the government by unauthorized acts. Office of Personnel Management v. Richmond. 496 U.S. 414, 110 L. Ed. 2d 387. 110 S. Ct. 2465. (1990).
“While the Merrill doctrine erects a high wall ... it does so only to protect governmental entities.” REW Enterprises, Inc, v. Premier Bank, N.A., 49 F.3d 163, 167 (5th Cir. 1995). In determining whether an entity is governmental for purposes of the Merrill doctrine, courts have focused exclusively upon the entity’s function as evidenced by congressional intent. “Whether an entity is governmental for purposes of estoppel does not turn on its label, such as agency, instrumentality, or private corporation, but rather on congressional intent. ” Id.; Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc., 72 F. Supp. 2d 547, 556 (W.D.Pa. 1999). “Classification as a government entity in [the Merrill] context turns on whether estoppel would thwart congressional intent. ” Mendrala v. Crown Mortgage Corp., 955 F.2d 1132, 1140 (9th Cir. 1992).

For Merrill purposes, Freddie Mac clearly is “governmental.” Congress created Freddie Mac with the intent to further an important governmental objective: to create, and provide stability in, a secondary market for residential mortgages. See 12 U.S.C. § 1451:12 U.S.C. $ 4501. The congressional purposes for Freddie Mac are clearly designed to serve the public by increasing the availability of mortgages on housing for low- and-moderate-income families and by promoting nationwide access to mortgages.” American Bankers Mortgage Corp. v. FHLMC, 75 F.3d 1401, 1406-07 (9th Cir. 1996).

Federal courts consistently have recognized that Freddie Mac was created by Congress with an intent to further an important governmental objective and thus qualifies as governmental for Merrill purposes. Mendrala. 955 F.2d at 1140; Deerman, 955 F. Supp. At 1400; Dupuis v. Federal Home Loan Mortgage Corp., 879 F. Supp. 139, 144 (D. Maine 1995): Siradas v. Chase Lincoln First Bank, 1999 U.S. Dist. LEXIS 15593, 1999 WL 787658 (S.D.N.Y. Sept. 30, 1999). This court agrees and finds that Freddie Mac is a federal instrumentality that is entitled to protection under the Merrill doctrine from liability for the unauthorized acts of its sellers/servicers.

[HN9] Conversely, the Merrill doctrine involves the distinct concept of whether a federal instrumentality should be bound by the unauthorized acts of its agents and is based on broader considerations involving separation of powers and public policy. Mendrala, 955 F.2d at 1140. In this context, the sole test is whether the entity is engaged in a governmental objective, and whether the government “controls” the entity is irrelevant. See, e.g., American Bakers, 75 F.3d at 1408. Here, as noted, Freddie Mac clearly has a governmental objective. In fact, plaintiff concedes that Freddie Mac’s objectives are governmental. Plaintiff’s Brief in Opposition at p.10 (“Freddie Mac satisfies the first prong of the [Lebrón] test”) For Merrill purposes, that is where the inquiry ends.

Plaintiffs also argue that the Merrill doctrine cannot be applied to protect Freddie Mac because Freddie Mac was restructured as a privately controlled and owned corporation under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (“FIRREA”), 12 U.S.C. § 1451 et seq. Plaintiff contends that, as a privately owned and controlled enterprise, Freddie Mac is no longer a governmental entity entitled *522 to the protection of the Merrill doctrine. However, FIRREA did not transform Freddie Mac into a purely private entity, but rather reorganized it as a “government sponsored private corporation” which retains numerous governmental attributes. For instance, Freddie Mac still has five of its 18 board members appointed by the President, and is subject to continuing oversight by the Department of Treasury and the Department of Housing and Urban Development. 12 U.S.C. §§ 1452(a)(l 1(b)(2). (d), (h)(2); § 1459(c), (e), & (f). Freddie Mac is required to submit annual reports to the United States House of Representatives and United States Senate (§ 1452(h)) and is exempt from state and local taxation (§ 1452(e)). Cases against Freddie Mac are deemed to arise under federal law and may be removed to federal court. § 1452(f). Most importantly, however, Freddie Mac retains under FIRREA its congressional purpose to create a secondary market for residential mortgages. 12 U.S.C. § 1451 note; 12 U.S.C. § 4501; American Bankers, 75 F.3d at 1406-07.
Although Freddie Mac now is a privately controlled corporation under FIRREA, [HN10] “a federal instrumentality does not divest itself of the privileges of instrumentality status when it acts more like a privately-owned institution than a federal agency.” Palev, supra (auotins Smith v. Russellville Production Credit Association, 777 F.2d 1544, 1550 (11th Cir. 1995). Rather, Freddie Mac still has at its core a public purpose established by Congress, which is to provide stability in, and to provide ongoing assistance to, a secondary market for home mortgages. Mendrala, 955 F.2d at 1140. “Holding the FHLMC responsible for the unauthorized actions of an entity such as [its seller/servicer] would thwart its congressional purpose." Id. at 1141. Because Freddie Mac retained its governmental objective, FIRREA did not alter Freddie Mac’s status as a federal instrumentality entitled to the protection of the Merrill doctrine.

Plaintiffs also argue that FIRREA stripped Freddie Mac of governmental immunity by placing Freddie Mac under private ownership and control. Here, however, Freddie Mac is not alleging that it is entitled to governmental immunity from suit, but instead is arguing under the Merrill doctrine that it should not be held liable for the acts of its servicers that it had not expressly authorized. As the court in Mendrala noted, “while it is true that [the principle that estoppel does not lie against the government] once rested largely on considerations of sovereign immunity, it is distinct from that doctrine and is supported by its own independent rationales. ” Mendrala, 955 F.2d at 1139. The fact that Freddie Mac is no longer entitled to immunity from suit under FIRREA does not affect its entitlement to protection from liability for the unauthorized acts of its agents under Merrill.

Finally, plaintiffs argue that because Freddie Mac now is privately controlled and owned under FIRREA, the policy underlying the Merrill doctrine, the protection of the public treasury, no longer is implicated. However, while the Merrill doctrine was designed in part to protect against “endless litigation over both real and imagined claims of misinformation by disgruntled citizens, imposing an unpredictable drain on the public fisc, ” (Richmond, 496 U.S. at 433), it was not the sole policy behind the doctrine. As the court in Dupuis noted, “the primary factor that drove the conclusion in Merrill is ... Congress’ ability to impose limits on what its creations may do. ” Dupuis, 879 F. Suvv. at 145. The court further noted that Congress established Freddie Mac with specific powers, and Freddie Mac “has within those powers explicitly limited the authority of its agents. Merrill directs that a court must observe these limitations. ” Id. Other courts as well have recognized this second policy underlying the Merrill doctrine. See McCauley v. Thygerson, 235 US. App. D.C. 376, 732 F.2d. 978, 982 (D.C.Cir. 1984) (respect must be given for congressional intent within our constitutional system of allocated powers); REW Enterprises. 49 F.3d at 167 (estopping an agency from disavowing an unauthorized act would validate the agency’s improper infringement on the authority of a coordinate branch). Accordingly, [HN11 ] because the Merrill doctrine implicates policy considerations beyond protection of the public treasury, the fact that Freddie Mac now is privately owned under FIRREA is not grounds to deny Freddie Mac the protection of the Merrill doctrine.

Because Freddie Mac is a federal instrumentality entitled to the protection of the Merrill doctrine, it is not bound by the unauthorized acts of its sellers/servicers that it relies upon to service the mortgage that it owns. As 
*523
approved Freddie Mac servicers, Community and Standard were governed by the terms of the Guide and certain other “purchase documents” as defined in § 1.2(a) of the Guide. Pursuant to § 1.2(a), a seller who sells mortgages to Freddie Mac or a_who contracts to provide services, is required to service those mortgages for Freddie Mac in accordance with the standards set forth in the Guide.

Here, the court finds that the alleged actions of Community and Standard occurred outside the scope of their express authority under the Guide. First, the complaint alleges in Counts III, TV and V that Freddie Mac’s servicers engaged in conduct that violated the Pennsylvania CPL. Accepting plaintiffs allegations as true for purposes of this motion to dismiss, Freddie Mac’s servicers violated the CPL by: (1) falsely representing that the South View mortgage authorized the placement of bill payments in escrow and that the mortgagors could be billed for maintenance of those accounts (Count III); (2) concealing that the servicers added loan advances to unpaid mortgages and charged interest for loan advances predating disbursement (Count TV); and (3) concealing that Freddie Mac was the owner of their mortgage (Count V).

However, Freddie Mac’s seller/servicer guide expressly prohibits its sellers/servicers from engaging in any conduct that violates any applicable state of federal law. Section 53.8 provides that: “The Servicer agrees to comply with the following laws, regulations, and order ... 
 All other applicable federal and state laws, regulations and orders.” Sections 51.4(a) of the Guide likewise mandates that “mortgages purchased by Freddie Mac must be serviced by a Servicer in accordance with the requirements of applicable law and the Purchase Documents.” More specifically, §2.11 of the Guide expressly provides that “if a Borrower inquires about the ownership of his or her Mortgage, and Freddie Mac owns the Mortgage, the Seller/Servicer must inform the Borrower that Freddie Mac owns the Mortgage once the Borrower’s identity is verified.” (Enfasis suplido) ”

Palowski v. 129 F. Supp. 2d 793.
IV
Dentro del marco jurídico antes enunciado, procedamos a resolver las controversias planteadas por la peticionaria.
En su Sentencia, el Tribunal de Primera Instancia señaló que existían controversias de hechos que impedían resolver el pleito sumariamente. Apuntó que las controversias eran, a saber, la naturaleza de la relación entre la peticionaria y R&G Mortgage; las actuaciones autorizadas por la ley federal en cuanto a la administración (servicing) de préstamos hipotecarios y actos u omisiones de la peticionaria relacionados con la reclamación que nos ocupa.
Comencemos apuntando que la peticionaria fue creada mediante ley con el propósito de crear un mercado secundario para préstamos hipotecarios. La peticionaria, a tales efectos, compra a las entidades bancarias que originan los préstamos hipotecas constituidas sobre residencias de clientes (deudores) con pocos o medianos recursos. Las hipotecas, una vez adquiridas, son servidas por los vendedores bajo los términos y condiciones establecidas. Véase, 12 U.S.C. see. 1452 etseq.
Por otro lado, y conforme se desprende de la Parte m de esta Sentencia, la peticionaria ha sido considerada como una instrumentalidad federal, toda vez que su creación obedeció a proveerle estabilidad al mercado de hipotecas residenciales. La jurisprudencia federal ha señalado que la peticionaria, por ser una instrumentalidad federal, no responde por los actos no autorizados de sus agentes; o sea, está protegida de responsabilidad vicaria por dichos actos torticeros. Por su parte, y conforme apuntado, la peticionaria le requiere a las instituciones que prestan servicios a sus préstamos a cumplir con los términos y condiciones pactadas en el “Single-Family- *524 Seller/Service Guide”. En dicho documento se establece que los “servicers” deben cumplir con las leyes aplicables.
En el caso de autos, surge del Service Agreement lo siguiente:

Article 1. Servicing of Mortgage

A. R-G Mortgage Corporation shall, from this date forward, be the servicer for each of the Mortgages, as more fully described in paragraph B of this Article. R-G Mortgage Corporation's obligations as servicer shall be those contained in the FHLMC (peticionaria) Servicer's Guide, and R-G Mortgage Corporation shall comply with the Servicer's Guide, as it now exists and as it may, from time to time, be amended, in all respect.

Por su parte, el Limited Power of Attorney suscrito por la peticionaria y R&G Mortgage reza, en lo pertinente:

“....constitutes and appoints R-G Mortgage Corporation, its true and lawful attorney-in-fact, and in its name, place and stead and for its use and benefit, to execute and acknowledge all documents with respect to home mortgages serviced for the undersigned by said attorney-in-fact, which are customarily and reasonably necessary and appropriate to (i) the commencement and completion of judicial and non-judicial foreclosure proceedings, including conveying title to real estate owned by the undersigned as a result of fore closure or the taking of a deed in lieu of foreclosure; (ii) the substitution of trustee(s) serving under a deed of trust for any reason in accordance with state law and the deed of trust; (in) the release of a mortgage, deed of trust or deed to secure debt upon payment and discharge of all sums secured thereby, as to one to four family mortgages, deeds of trust or deeds to secure debt owned by the undersigned and serviced by the undersigned by said attorney-in-fact, whether the undersigned is named therein as mortgage or beneficiary or has become mortgagee or beneficiary by virtue of assignment of such mortgage deed of trust or deed to secure debt; (iv) the closing of title to property to be acquired by FHLMC (peticionaria) as real estate owned (REO), deliver the deed and any other instrument required and to receive checks or cash or any payments to be made in connection therewith, and to receive on FHLMC (peticionaria) behalf any money payable to FHLMC (peticionaria) at the closing, whether for purchase price or adjustment of taxes, insurance premiums, or otherwise, and further to pay any amounts required to be paid by FHLMC (peticionaria), whether for taxes or otherwise; and (v) the completion of loan assumption agreements. ”

Véase, Anejo 182 del Apéndice.
Como bien apunta la peticionaria, durante las vistas del caso, la recurrida esbozó al Tribunal de Primera Instancia la relación entre la peticionaria y R&G Mortgage. Señaló que la peticionaria “es el dueño de la hipoteca. R-G sencillamente le da servicio a esas hipotecas. R-G coge el dinero, lo administra, se lo entrega a Freddie Mac (peticionaria) ... Y R-G vela porque el deudor haga los pagos, el deudor pague las cuestiones de contribuciones y pague la reserva y pague...R-G administra el préstamo.... Y para todos los efectos legales hay un poder bien inclusivo, para todos los efectos legales Freddy Mac (peticionaria) opera, es agente, o sea, no solamente es “servicer”, es “servicer” en términos de las hipotecas, pero para todas las gestiones que realiza es el agente de Freddy Mac (peticionaria). Es el agente de la Federal Home (peticionaria). ” (Véase, Anejo 200 del Apéndice, alapágs. 1585-6.)
Asimismo, surge que la recurrida admitió en la vista del caso que la peticionaria era una agencia cuasi federal que presta dinero a los Bancos para que ellos los presten para adelante. 
*525 No nos cabe duda que R&G Mortage es un “servicer” de la peticionaria y conforme a esto debe cumplir con el “Single-Family-Seller/Service Guide”.
Por otro lado, surge de autos que quien proveyó el servicio y manejó las cuentas de la recurrida fue R&G Mortgage. Esta realizó las gestiones de cobro de la hipoteca, mantuvo las cuentas necesarias -incluyendo las de plica para contribuciones y seguros del inmueble-, realizó los pagos necesarios -a saber, los pagos de principal e intereses del préstamo a la peticionaria-, los pagos para contribuciones al Estado y pagos a las compañías de seguros para las pólizas sobre el inmueble. No existe en autos documentación o prueba alguna que señalé que la peticionaria tuvo algún contacto con la recurrida o su madre. Siendo ello así, los alegados actos torticeros, si ocurrieron, fueron incurridos por R&G Mortgage en su calidad de servicer.
En el caso de autos, al igual que en las decisiones federales citadas, la recurrida descansa su reclamación en alegados actos de R&G Mortgage y no en actos realizados o donde participara la peticionaria. Somos de opinión que la peticionaria está protegida por la Doctrina Merrill por lo que no puede ser demandada por las alegadas acciones no autorizadas de sus “servicers”.
Por último, la recurrida en su comparecencia a este Tribunal, no presenta controversias de hechos que impidan resolver el pleito sumariamente. Más bien, los planteamientos van dirigidos a controversias de derecho, en particular la aplicación de la Doctrina Merrill.
A tales efectos, entendemos que al no existir controversia real sustancial en el caso de autos en cuanto a ningún hecho material, como cuestión de derecho, procede dictar sentencia sumaria a favor de la peticionaria, Federal Home Loan Mortgage Corp., desestimándose la reclamación en su contra.
V
Por los fundamentos antes esbozados, se expide el auto de certiorari solicitado y se revoca la Sentencia recurrida. Se dicta Sentencia desestimando la reconvención instada en contra de la peticionaria.
Así lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones